No. 2013-1504, -1505

# In the United States Court of Appeals
# For the Federal Circuit

DDR HOLDINGS, LLC,
*Plaintiff-Appellee,*

**v.**

HOTELS.COM, L.P., CENDANT TRAVEL DISTRIBUTION SERVICES
GROUP, INC., EXPEDIA, INC., TRAVELOCITY.COM, L.P., SITE59.COM,
LLC, INTERNATIONAL CRUISE & EXCURSION GALLERY, INC.,
OURVACATIONSTORE, INC., INTERNETWORK PUBLISHING
CORPORATION, and ORBITZ WORLDWIDE, LLC,
*Defendants,*

and

NATIONAL LEISURE GROUP, INC. and WORLD TRAVEL HOLDINGS, INC.,
*Defendants-Appellants,*

and

DIGITAL RIVER, INC.,
*Defendant-Appellant.*

Appeals from the United States District Court for the Eastern District of Texas in
No. 06-CV-0042 Judge Rodney Gilstrap

## BRIEF OF PLAINTIFF-APPELLEE
## DDR HOLDINGS, LLC

Louis J. Hoffman, *Principal Counsel*
HOFFMAN PATENT FIRM
14301 North 87th Street, Suite 312
Scottsdale, Arizona 85260
Telephone: (480) 948-3295
Facsimile: (480) 948-3387
E-Mail: louis @valuablepatents.com

Ian B. Crosby, *Of Counsel*
SUSMAN GODFREY LLP
1201 Third Avenue, Suite 3800
Seattle, Washington 98101
Telephone: (206) 516-3861
Facsimile: (206) 516-3883
E-Mail: icrosby@susmangodfrey.com

*Attorneys for Plaintiff-Appellee DDR Holdings, LLC*

# CERTIFICATE OF INTEREST

Counsel for the Appellee DDR Holdings, LLC certifies the following:

1.      The full name of every party or amicus represented by me is:

 DDR Holdings, LLC

2.      The name of the real party in interest represented by me is:

 N/A

3.      All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

 None.

4.      The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

Hoffman Patent Firm (Louis J. Hoffman); Susman Godfrey LLP (Ian B. Crosby, Ophelia F. Camina, LeElle Krompass); Siebman Burg Philips & Smith (Michael C. Smith); The Roth Law Firm, P.C. (Carl R. Roth (terminated 01/24/2008))


       December 20, 2013            /s/ Louis J. Hoffman
              Date                 Signature of Counsel


                                    Louis J. Hoffman
                                   Printed Name of Counsel

i

# TABLE OF CONTENTS

CERTIFICATE OF INTEREST ............................................................. i

TABLE OF AUTHORITIES ...............................................................v

STATEMENT OF RELATED CASES ..................................................1

STATEMENT OF THE ISSUES...........................................................1

STATEMENT OF THE CASE...............................................................3

STATEMENT OF THE FACTS ............................................................5

    1.  The inventive environment. .................................................5

    2.  The patented system. ..........................................................5

    3.  Improvements over prior art.................................................9

    4.  The inventors' practicing of the invention..............................10

    5.  The asserted claims. ..........................................................12

    6.  Successful '572 Patent reexamination and '399 Patent grant.................15

    7.  Defendants' challenges to the patents after the stay. ...............16

    8.  Infringement evidence presented at trial..................................18

    9.  The verdict and subsequent procedural history. .......................20

SUMMARY OF THE ARGUMENT ....................................................20

ARGUMENT – STANDARD OF REVIEW ..........................................23

ARGUMENT ....................................................................................25

  I.  The Infringed Claims Are Definite. ............................................25

    a.  The term "look and feel" does not require subjective judgment.................26

    b.  The specification contains sufficient teachings............................37

    c.  Trial testimony did not uniformly prove indefiniteness............................40

  II.  The Jury Heard Substantial Evidence to Support Its Finding That Digital River Had Not Proven Anticipation of the '572 Patent from Its "Secure Sales System" by Clear and Convincing Evidence.......................................44

III.   The Jury Heard Substantial Evidence to Support Its Finding That Digital River Had Not Proven Obviousness of the '572 Patent from Its "Secure Sales System" by Clear and Convincing Evidence. ..................................................... 47

   a.   Substantial evidence supports the jury's non-obviousness finding. .......... 47

   b.   Substantial evidence supports the jury's finding that SSS combined with Tobin did not make dependent claim 20 obvious. ............................................ 51

IV.   DDR Did Not "Disclaim" Patent Coverage for Scenarios Where the Host and Merchant Are a Single Business Entity That Is a Third Party to the Outsource Provider. ............................................................................................. 52

   a.   The district court had the power to clarify its claim construction, so any inconsistencies with its earlier *Markman* rulings do not matter. ...................... 52

   b.   The district court properly construed the claims asserted against Digital River as covering the scenario "where one party plays the dual role of Host and Merchant," disclosed by the specification. ....................................................... 54

V.   The '572 and '399 Patents Claim Patentable Subject Matter. ...................... 60

VI.   The Court Properly Exercised Its Discretion to Allow DDR to Prove Infringement in Connection with Six of Nine WTH Customer Websites. ........... 68

VII.   The Jury Heard Substantial Evidence of WTH's Infringement of the '572 and '399 Patents. ....................................................................................................... 70

   a.   The jury saw and heard substantial evidence of overall "look and feel" correspondence. ................................................................................................. 70

   b.   The jury heard substantial evidence that WTH servers were "in communication through the Internet with" Host web pages ('572 Patent, claim 13). ...................................................................................................................... 72

   c.   The jury heard substantial evidence that WTH directed its customers to place links in Host pages ('572 Patent, claim 17). ........................................... 73

   d.   The jury heard substantial evidence that WTH's servers automatically recognize a source web page of a Host ('399 Patent). ..................................... 75

   e.   WTH's "evidence only on one day" argument lacks basis. ....................... 76

VIII.   WTH's Challenge to "DDR's Damages Model" and the Jury's Damages Award Does Not Justify Reversal. ....................................................................... 77

IX.     The Trial Court Properly Exercised Its Discretion in Awarding DDR
Prejudgment Interest. ........................................................................79

CONCLUSION ...................................................................................81

CERTIFICATE OF SERVICE ...............................................................82

CERTIFICATE OF COMPLIANCE.........................................................83

# TABLE OF AUTHORITIES

## Cases

*Accenture Global Services, GmbH v. Guidewire Software, Inc.*, 728 F.3d 1336 (Fed. Cir. 2013)...............................................................................62

*Acumed LLC v. Stryker Corp.*, 483 F.3d 800 (Fed. Cir. 2007)................................34

*Akamai Technologies Inc. v. Limelight Networks, Inc.*, 692 F.3d 1301 (Fed. Cir. 2012) (en banc) ...........................................................................73

*Amgen Inc. v. F. Hoffman-La Roche Ltd.*, 580 F.3d 1340 (Fed. Cir. 2009).............33

*Anchor Wall Systems, Inc. v. Rockwood Retaining Walls, Inc.*, 340 F.3d 1298 (Fed. Cir. 2003) .......................................................................36

*Andrew Corp v. Gabriel Electronics Inc.*, 847 F.2d 819 (Fed. Cir. 1988)........ 32, 39

*Apple, Inc. v. Samsung Electronics Co.*, 932 F. Supp. 2d 1076 (N.D. Cal. 2013) ............................................................................ 30, 33

*Aria Diagnostics, Inc. v. Sequenom, Inc.*, 726 F.3d 1296 (Fed. Cir. 2013)....... 56, 59

*Aro Manufacturing Co. v. Convertible Top Replacement Co.*, 365 U.S. 336 (1961) ............................................................................62

*Bancorp Services, L.L.C. v. Sun Life Assurance Co. of Canada (U.S.)*, 687 F.3d 1266 (Fed. Cir. 2012)...................................................................62

*Bilski v. Kappos*, 130 S. Ct. 3218 (2010).................................... 60, 67, 68

*BJ Services Co. v. Halliburton Energy Services, Inc.*, 338 F.3d 1368 (Fed. Cir. 2003) .................................................................... 32, 40

*Bueno v. City of Donna*, 714 F.2d 484 (5th Cir. 1983)...........................................78

*CLS Bank International v. Alice Corp.*, 717 F.3d 1269 (Fed. Cir. 2013) (en banc), *cert. granted*, 82 U.S.L.W. 3131 (U.S. Dec. 6, 2013) (No. 13-298) ............................................................................................... 60-62, 65, 67

*Conoco, Inc. v. Energy & Environmental International, L.C.*, 460 F.3d 1349 (Fed. Cir. 2006) ......................................................................................... 73, 76

*Cybersource Corp. v. Retail Decisions, Inc.*, 654 F.3d 1366 (Fed. Cir. 2011) .......66

*Cybor Corp. v. FAS Technologies, Inc.*, 138 F.3d 1448 (Fed. Cir. 1998) (en banc) ........................................................................................... 59, 60

*Datamize, LLC v. Plumtree Software, Inc.*, 417 F.3d 1342 (Fed. Cir. 2005) ................................................................................. 27, 29-31, 36

*Dealertrack, Inc. v. Huber*, 674 F.3d 1315 (Fed. Cir. 2012)...................................66

*Deere & Co. v. Bush Hog, LLC*, 703 F.3d 1349 (Fed. Cir. 2012)...........................31

*DeWitt v. Brown*, 669 F.2d 516 (8th Cir. 1982)......................................................78

*Diamond v. Chakrabarty*, 447 U.S. 303 (1980)......................................................68

*Diamond v. Diehr*, 450 U.S. 175 (1981).......................................................... 64, 68

*Ecolab, Inc. v. Envirochem, Inc.*, 264 F.3d 1358 (Fed. Cir. 2001) ............. 32, 34, 35

*Egyptian Goddess, Inc. v. Swisa, Inc.*, 543 F.3d 665 (Fed. Cir. 2008) (en banc).....33

*Energy Servs., Inc. v. M-I LLC*, 514 F.3d 1244 (Fed. Cir. 2008) ...........................35

vi

*Enzo Biochem, Inc. v. Applera Corp.*, 599 F.3d 1325 (Fed. Cir. 2010) ............................................................................ 32, 34, 35, 37, 38

*Exxon Research & Engineering Co. v. United States*, 265 F.3d 1371 (Fed. Cir. 2001) ................................................................ 30, 34

*Fresenius USA, Inc. v. Baxter International, Inc.*, 582 F.3d 1288 (Fed. Cir. 2009) ...................................................................48

*General Motors Corp. v. Devex Corp.*, 461 U.S. 648 (1983)...................................80

*Harris Corp. v. Ericsson, Inc.*, 417 F.3d 1241 (Fed. Cir. 2005) ........... 23, 24, 67, 72

*Hearing Components, Inc. v. Shure Inc.*, 600 F.3d 1357 (Fed. Cir. 2010) . 36, 38, 39

*Honeywell International, Inc. v. United States*, 609 F.3d 1292 (Fed. Cir. 2010) ........................................................... 29, 37

*i4i L.P. v. Microsoft Corp.*, 598 F.3d 831 (Fed. Cir. 2010), *aff'd*, 131 S. Ct. 2238, 2242 (2011)............................................... 23, 24, 44, 49

*In re Alappat*, 33 F.3d 1526 (Fed. Cir. 1994) ........................................................65

*In re Marosi*, 710 F.2d 799 (Fed. Cir. 1983)................................................... 32, 39

*Industrias Magromer Cueros y Pieles S.A. v. La. Bayou Furs Inc.*, 293 F.3d 912 (5th Cir. 2002)........................................................ 24, 78

*Invitrogen Corp. v. Biocrest Manufacturing, L.P.*, 424 F.3d 1374 (Fed. Cir. 2005) ....................................................................28

*Key Pharmaceuticals v. Hercon Laboratories Corp.*, 161 F.3d 709 (Fed. Cir. 1998) ....................................................................60

*Kinetic Concepts, Inc. v. Blue Sky Medical Group, Inc.*, 554 F.3d 1010 (Fed. Cir. 2009) ..........................................................................................................49

*Lam, Inc. v. Johns-Manville Corp.*, 718 F.2d 1056 (Fed. Cir. 1983) ......................76

*Lighting Ballast Control LLC v. Philips Electronics N.A.*, Nos. 2012-1014, -1015 (Fed. Cir. 2013) (pending en banc) ................................................................59

*Litton Systems, Inc. v. Whirlpool Corp*, 728 F.2d 1423 (Fed. Cir. 1984)................33

*Lucent Technologies, Inc. v. Gateway, Inc.*, 580 F.3d 1301 (Fed. Cir. 2009).........74

*Lummus Industries, Inc. v. D.M. & E. Corp.*, 862 F.2d 267 (Fed. Cir. 1988).........80

*Mayo Collaborative Services v. Prometheus Laboratories, Inc.*, 132 S. Ct. 1289 (2012)...............................................................................................................62

*Metabolite Laboratories, Inc. v. Laboratory Corp. of America Holdings*, 370 F.3d 1354 (Fed. Cir. 2004).....................................................................................29

*Mettler-Toledo, Inc. v. B-Tek Scales, LLC*, 671 F.3d 1291 (Fed. Cir. 2012) ...........23

*Microsoft Corp. v. i4i L.P.*, 131 S. Ct. 2238 (2011) ......................................... 44, 49

*Modine Manufacturing Co. v. U.S. International Trade Commission*, 75 F.3d 1545 (Fed. Cir. 1996)..................................................................................... 34, 36

*Muniauction, Inc. v. Thomson Corp.*, 532 F.3d 1318 (Fed. Cir. 2008)...................73

*NTP, Inc. v. Research in Motion, Ltd.*, 418 F.3d 1282 (Fed. Cir. 2005) .................68

*Orthokinetics, Inc. v. Safety Travel Chairs, Inc.*, 806 F.2d 1565 (Fed. Cir. 1986) ....................................................................................................... 28, 29

*Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (en banc) ............ 54, 55, 59

*Praxair, Inc. v. ATMI, Inc.*, 543 F.3d 1306 (Fed. Cir. 2008) ...................................43

*Pressure Products Medical Supplies, Inc. v. Greatbatch Ltd.*, 599 F.3d 1308 (Fed. Cir. 2010) ............................................................................................................52

*Research Corp. Technologies, Inc. v. Microsoft Corp.*, 627 F.3d 859 (Fed. Cir. 2010) ...........................................................................................................66

*Salve Regina College v. Russell*, 499 U.S. 225 (1991)............................................60

*SanDisk Corp. v. Memorex Products, Inc.*, 415 F.3d 1278 (Fed. Cir. 2005) ..........55

*Seattle Box Co., Inc. v. Industrial Crating & Packing, Inc.*, 731 F.2d 818 (Fed. Cir. 1984) ...........................................................................................................29

*Shatterproof Glass Corp. v. Libbey–Owens Ford Co.*, 758 F.2d 613 (Fed. Cir. 1985) ...................................................................................................................36

*SiRF Technology, Inc. v. International Trade Commission*, 601 F.3d 1319 (Fed. Cir. 2010)...........................................................................................................65

*SmithKline Beecham Corp. v. Apotex Corp.*, 403 F.3d 1331 (Fed. Cir. 2005) ........28

*Star Scientific, Inc. v. R.J. Reynolds Tobacco Co.*, 537 F.3d 1357 (Fed. Cir. 2008) ...................................................................................................................28

*Star Scientific, Inc. v. R.J. Reynolds Tobacco Co.*, 655 F.3d 1364 (Fed. Cir. 2011) ............................................................................................................ 25, 34

*Tec Air, Inc. v. Denso Manufacturing Michigan Inc.*, 192 F.3d 1353 (Fed. Cir. 1999) ........................................................................................... 49, 50, 51

*Technology Licensing Corp. v. Videotek, Inc.*, 545 F.3d 1316 (Fed. Cir. 2008)......40

*TecSec, Inc. v. International Business Machines Corp.*, 731 F.3d 1336 (Fed. Cir. 2013) ...........................................................................34

*Telcordia Technologies, Inc. v. Cisco Systems, Inc.*, 612 F.3d 1365 (Fed. Cir. 2010) ...................................................................... 24, 80

*Transocean Offshore Deepwater Drilling, Inc. v. Maersk Drilling USA, Inc.*, 699 F.3d 1340 (Fed. Cir. 2012), *petition for cert. filed,* 82 U.S.L.W. 3067 (U.S. July 6, 2013) (No. 13-43) ...................................................... 23, 24

*Ultramercial, Inc. v. Hulu, LLC*, 722 F.3d 1335 (Fed. Cir. 2013) . 61, 63, 65, 66, 67

*United States v. Ollison*, 555 F.3d 152 (5th Cir. 2009) ..........................................71

*Utah Medical Products, Inc. v. Graphic Controls Corp.*, 350 F.3d 1376 (Fed. Cir. 2003) ...........................................................................52

*Verve, LLC v. Crane Cams, Inc.*, 311 F.3d 1116 (Fed. Cir. 2002).................... 32, 36

*Wellman, Inc. v. Eastman Chemical Co.*, 642 F.3d 1355 (Fed. Cir. 2011) ................................................................. 25, 34, 36, 43

*Young v. Lumenis, Inc.*, 492 F.3d 1336 (Fed. Cir. 2007) ........................................38

## Statutes and Other Authorities

U.S. Const. art. I, §8, cl. 8 ...............................................................36

35 U.S.C. §112(1) ...............................................................38

35 U.S.C. §112(2) ................................................................ 18, 25, 27, 33, 36, 39

35 U.S.C. §284 ...............................................................79

35 U.S.C. §100(b) ...............................................................68

x

35 U.S.C. §101 ................................................................ 2, 18, 22, 60, 62, 65, 67, 68

35 U.S.C. §171 .................................................................................................33

35 U.S.C. §282 ........................................................................................... 25, 68

E.D. Tex. L.R. 3-3.............................................................................................70

E.D. Tex. L.R. 3-6(a) .......................................................................................70

http://www.uspto.gov/web/offices/ac/ido/oeip/taf/issuyear.htm ............................33

## STATEMENT OF RELATED CASES

Plaintiff-appellee DDR Holdings, LLC ("DDR") is not aware of any other appeal in connection with this matter or any related case that was previously before this or any other court. This Court's decision in this appeal may or may not affect the following pending cases in the Eastern District of Texas, Marshall Division: *DDR Holdings, LLC v. World Travel Holdings, Inc.*, Civil Action No. 2:13-cv-646 and *DDR Holdings, LLC v. Digital River, Inc.*, Civil Action No. 2:13-cv-647.

## STATEMENT OF THE ISSUES

1.      Whether the district court correctly held that the claim term "look and feel" was not insolubly ambiguous because (a) the parties agreed how to construe that claim term, and (b) deciding whether the "look and feel" of two web pages corresponded presented a non-subjective question for jury determination.

2.      Whether substantial evidence supports the jury's finding that the Secure Sales System ("SSS") prior art did not anticipate claims 13, 17, and 20 of the '572 Patent.

3.      Whether substantial evidence supports the jury's finding of non-obviousness of claims 13, 17, and 20 of the '572 Patent, despite Digital River's skeletal arguments that SSS alone obviated those claims and that SSS in combination with Tobin obviated dependent claim 20.

1

4.      Whether the district court correctly held that, viewed in context, DDR's comments to the PTO during reexamination of the '572 Patent did not disclaim a clearly disclosed embodiment in which a single company acts as both Host and Merchant.

5.      Whether substantial evidence, including the corresponding overall appearance of WTH's websites and its Hosts' web pages and expert testimony of the technical workings of the accused WTH platform, supports the jury's finding that WTH infringed the patents.

6.      Whether material claim limitations, directed to computer-based technology, confirm that the asserted claims fail to cover all possible ways to perform an abstract idea and thus constitute patentable subject matter under §101.

7.      Whether to affirm the district court's decision to allow DDR's expert to testify about six of the nine accused websites implemented by WTH's common "platform," when DDR accused the platform timely under the local rules.

8.      Whether WTH can reduce the jury's allegedly "grossly excessive" damage award by challenging DDR's "damages theory," when WTH did not move for a new trial or seek remittitur, and when the jury awarded less than DDR sought.

9.      Whether the district court acted within its discretion by awarding DDR pre-judgment interest after DDR made a "not unreasonable" request to stay the case pending reexamination of the '572 Patent.

## STATEMENT OF THE CASE

On January 31, 2006, DDR sued defendants-appellants Digital River, Inc. and National Leisure Group, Inc. for infringement of U.S. Patent 6,993,572 ("the '572 Patent"). A122; A255, 61-64. Later in 2006, DDR filed a reexamination of the '572 Patent and obtained a district court stay. A413-14.

After an administrative appeal, on July 20, 2010, the PTO issued a certificate confirming the patentability of the reexamined claim. A709-10. On October 19, 2010, the PTO also issued U.S. Patent 7,818,399 ("the '399 Patent") as a continuation of the '572 Patent. A163.

The district court reopened the case, A469, and approved a "Third Amended Complaint" adding the '399 Patent, A481.[1] The parties agreed on the construction of nearly all claim terms, including "look and feel." A1042-44; A1062. Defendants unsuccessfully sought summary judgment of indefiniteness. A42.

After the court construed a few disputed claim terms, through a *Markman* hearing, and resolved another claim-construction issue by denying Digital River's pre-trial summary judgment motion, the case proceeded to trial on October 8-12, 2012. A2599-607; A2857-61; A2805-14.

---

[1] Appellant World Travel Holdings, Inc. acquired National Leisure Group, Inc., and DDR further amended its complaint to name WTH in 2011. A551; A558. This brief uses "WTH" to refer to both entities.

The trial addressed DDR's claims against Digital River for infringement of '572 Patent, claims 13, 17, and 20 in connection with seven customers, and against WTH for infringement of '572 Patent, claims 13, 17, and 20 and '399 Patent, claims 1, 3, and 19 in connection with nine customers.

At trial, Digital River argued that prior use of the SSS system anticipated claims 13, 17, and 20 of the '572 Patent and that SSS, combined with U.S. Patent 6,141,666 ("Tobin"), A6509, rendered dependent claim 20 obvious. WTH did not challenge the validity of the '572 or '399 Patents, instead arguing that it did not infringe any of the asserted claims.

The jury issued a verdict in favor of DDR, finding (1) that the '572 Patent was not invalid and (2) that both defendants had infringed the patents asserted against them. A3078-79. The jury awarded damages of $750,000 against each company, considerably less than DDR sought. A3080.

Appellants filed renewed JMOL motions, and Digital River moved for a new trial. The district court denied the motions and entered judgment, including pretrial interest, for $1,061,960.70 against each company. A4-35; A1-3; A36-41.

## STATEMENT OF THE FACTS

### 1. <u>The inventive environment</u>.

At the time the inventors conceived of the invention, in 1997 and 1998, the Internet had only about 100,000 websites, compared to a half billion today, Google did not yet exist, and even email was uncommon. A3142; A3201-04; A3379-80.

Amazon.com had just begun to establish "affiliate programs," a system by which a website owner, could list certain books (or other goods) on the website, and a computer visitor interested in the book could click through to Amazon.com's website, where the visitor could buy the book, whereupon Amazon paid a small commission to the affiliate. A148 at 2:9-20.

By 1998, also, Digital River apparently had operated its "Secure Sales System" ("SSS") for two years, providing order-fulfillment services for sellers of software. Essentially, Digital River ran "shopping carts" for software sellers and downloaded the purchased software to purchasers' computers. Digital River collaborated with its customers to craft the "sales" pages. *E.g.*, Digital River's Brief ("DR"), p. 9; A6135-66; A4202.

### 2. <u>The patented system</u>.

The inventors filed a provisional patent application on September 17, 1998, containing flow charts and business descriptions. A3234; A3319; A5147-69. The inventors filed a regular patent application one year later, with 24 drawing sheets

and 26 columns of detailed disclosure, including business functions, computer architecture, program flowcharts, system modules, pseudocode, interface images, and visual screen examples. A122-61 ('572 Patent; same specification as in 1998).

The inventors perceived a problem with existing systems: "Affiliate program" websites did not receive sufficient benefit because "Amazon.com and other online stores" use such programs to "lure the visitor traffic away from the affiliate." A148 at 2:26-40.

The inventors conceived of a "new paradigm of co-marketing," to attract more popular sites, whose owners liked the affiliate revenue but did not want to lose visitors. *Id*. at 2:21-26, 2:40-60. The invented system generally relates to "outsource electronic commerce facilities" that could support affiliates, now called "Hosts," in "a context sensitive, transparent manner." *Id*. at 1:19-21.

The patent uses the term "transparent" to denote that the system "enables Hosts to control the customer experience" despite the fact that the Host would allow "a server other than the host," run by an entity called an "e-commerce Outsource Provider," to serve a "shopping page." A148 at 2:59; A149 at 3:20-21, 36-37; A154 at 14:20. The "shopping page" would "retain[] the host's look and feel." A154 at 14:21-22. "Such pages give the viewer of the page the impression that she is viewing pages served by the host." A149 at 3:23-24.

The patent achieves this goal by this technical method: "Hosts may include links to selected products or product categories within pages residing on the Hosts' website. Upon actuation of such a link by a visitor of the Host website, a page is presented to the visitor incorporating a replica of the Host's look and feel directed to the sale of the selected products or product categories." A149 at 3:9-15.

According to the patent specification, "'Look and feel elements' include logos, colors, page layout, navigation systems, frames, 'mouse-over' effects, or other elements that are consistent through some or all of a Host's website." A154 at 14:10-14. The specification shows several visual examples of individual pages, whose overall "look and feel" contained many of those "elements." *E.g.*, A136, 40 (Figs. 15, 19).

The system utilizes computer technology to achieve the desired business advantages, including a "scalable architecture … to serve dynamically constructed pages … served by the e-commerce outsource provider." A149 at 3:35-37. Scalability meant that "[a]ny request from an end user may be fielded by any" server yet still display the proper "look and feel description associated with" the correct Host website. *Id.* at 3:42-60, 4:48-51.

In the system, "Merchants are the producers, distributors, or resellers of the goods to be sold through the outsource provider." A159 at 23:18-19. Merchants are

therefore different from the Outsource Provider. A Host wishes to sell Merchant products by listing them on the Host's website. A148 at 2:14-17, 60-61.

Unlike the Amazon.com affiliate system, in the patent, "There are three main parties …, excluding the end consumer. These parties include Merchants, Hosts, and the e-commerce outsource provider. This folds into two parties where one party plays the dual role of Host and Merchant." A159 at 23:10-15.

The patented system contemplates that the Outsource Provider gives the Host a "link" that "correlates the host website with a commerce object for inclusion within a page on the host website and which, when activated, causes the processor to serve an e-commerce supported page via the communication link." A149 at 4:55-58. The Commerce Object is the product, or product catalog, of the Merchant, selected by the Host, associated with the link. A149 at 3:9-15; A155 at 15:11-16.

Upon recognizing link activation, the system pulls data "associated with the host website" from a "data store" and serves the page. A149 at 4:49-50.

The "shopping page" served by the Outsource Provider is a "composite page" with two parts. The first part is "a look and feel corresponding to" (or "based on") the "look and feel description" in the "data store," so that it "retain[s] the host's look and feel." A149 at 4:49-50, 59-61; A154 at 14:18-22. The second part is "content based on the commerce object associated with the link." A149 at 4:49-50, 59-62.

8

The system recognizes from which Host's site each visitor came, so as to retrieve and display the correct "look and feel" within the "composite page." A visitor interested in a particular product who clicks from a first Host's website will see a first "look and feel," while a different visitor who clicks from a second Host's website will see a second, different "look and feel." The system uses the links to identify the Host and the Commerce Object. A155 at 15:13-16. The links are technically necessary; without them the system cannot operate. A3679.

The patent specification explains the purpose of "look and feel" correspondence as "giv[ing] the viewer of the page the impression that she is viewing pages served by the host." A149 at 3:22-24.

### 3. <u>Improvements over prior art</u>.

Like the Amazon.com-type "affiliate programs" discussed in the patent's "background of the invention," the Digital River "online-ordering" SSS system used links between a pair of websites. Also similar to Amazon.com-type programs, the customer web pages did not correspond closely to the linked-to SSS web pages. A3535, 38-41 (competitive research showed that Digital River and other sites did not match linked sites). The specific purposes of the prior art systems evidently did not make it important to use links that enabled the linked-to site to display a corresponding "look and feel" in terms of overall appearance and style of the sites.

Digital River serviced a thousand websites using SSS during the prior art period. A4208. The closest-corresponding appearance that Digital River showed at trial was a comparison between a page from its customer, Digital Frontiers, A7502, and the page from SSS for that customer, A7494. In that example, the pages had in common little more than a logo; they did not correspond in overall appearance. A4194-97; A4247. Indeed, Digital Frontiers' president sent an email blasting Digital River for "poor execution," saying that Digital River's website did not look right. A4198-201; A7106-07.

During the prior-art period, the platform implementing SSS had "much more limited … functionality" that Digital River's later systems and suffered from "technical constraints" that made it "difficult to emulate sites." A3473-75; A4235; A4245-47. SSS could display little more than the Host's logo, and even then with difficulty – the logo's placement on the page would correspond to the Host's only coincidentally or by using a "hack." A3472-75; A4244-48.

### 4.    The inventors' practicing of the invention.

Beginning in 1997, co-inventor Danny Ross, a former executive in early computer companies (IBM, Memorex, and Timex Computers), who also had been working with start-ups as a venture capitalist, worked with his son, co-inventor Del Ross, and his son's college and Wharton business school friend, co-inventor Joe Michaels, to start a new Internet business. A3211-12; A3195-96; A3202-03;

10

A3210-11; A3363-72; A3522-23; A3525. Del went on to work as a top marketing VP at Intercontinental Hotels Group. A3192-93. Joe has enjoyed a successful career at Microsoft. A3191-93; A3522.

In 1998, the three founders engaged two talented software programmers, Randy May and Rich Anderson, to assist them in developing the system. A3211. The five men collaborated, through many meetings, to develop specific computer technology to implement the original marketing concepts. A3379; A3335-36.

The inventors' system supported a company, called Nexchange Corporation, which operated for several years beginning in Fall 1998. Nexchange received millions of dollars of venture financing and at its height employed over 100 people. A3428-29; A3543. The system's scalability allowed Nexchange to act as Outsource Provider for tens of thousands of Hosts simultaneously and to recruit dozens of Merchants. A3224; A3339; A3350; A3541-42.

Both Merchants and Hosts considered the Nexchange computer system valuable to their business: Nexchange's "reach" (an Internet term defining the number of potential visitors who saw Nexchange "stores") soared to more than half of all Internet users. A3223-24; A3235; A3378. Despite its early success, Nexchange failed a few years later, from lack of later-round financing after the bursting of the "Internet bubble." A3235-36; A3381-83; A3541-43; A4261.

11

In late 2001, Danny Ross contracted to acquire the intellectual property assets from the liquidating Nexchange business, including a single, unexamined patent application. A3238; A3390; A7255-56. Danny and Del Ross later formed a company, DDR, and Danny closed the acquisition, then transferred the patent application to DDR. A3391.

DDR worked on the pending application, and a first patent issued in September 2003. A82. The '572 Patent issued as a continuation in January 2006. A122. The '399 Patent later issued as another continuation. A163.

## 5.    **The asserted claims.**

System claim 13 of the '572 Patent (A162[2]) states:

13. An e-commerce outsourcing system comprising:
a) a data store including a look and feel description associated with a host web page having a link correlated with a commerce object; and
b) a computer processor coupled to the data store and in communication through the Internet with the host web page and programmed, upon receiving an indication that the link has been activated by a visitor computer in Internet communication with the host web page, to serve a composite web page to the visitor computer with a look and feel based on the look and feel description in the data store and with content based on the commerce object associated with the link.

This system claim 13 requires "a data store" and "a computer processor"; those must be "coupled"; and they are "in communication through the Internet with the host web page." The system responds to "an indication that the link has been

---

[2] The claims as reproduced here include corrections made in a PTO certificate of correction. A708.

activated by a visitor computer," and the processor is programmed "to serve a composite web page" (described in part 2 above). The "composite web page" has "a look and feel based on the look and feel description in the data store." *Id*.

Method claim 17 of the '572 Patent (A162) states:

> 17. An e-commerce outsourcing process comprising the steps of:
> a) storing a look and feel description associated with a first website in a data store associated with a second website;
> b) including within a web page of the first website, which web page has a look and feel substantially corresponding to the stored look and feel description, a link correlating the web page with a commerce object; and
> c) upon receiving an activation of the link from a visitor computer to which the web page has been served, serving to the visitor computer from the second website a composite web page having a look and feel corresponding to the stored look and feel description of the first website and having content based on the commerce object associated with the link.

Compared to system claim 13, method claim 17 likewise requires the links correlated with a Commerce Object and the "composite web page" but does not require "communication … with the host web page." *Id*.

Claim 20 of the '572 Patent (*id*.), dependent on claim 17, specifies a particular option for the "look and feel description," namely that it include "a set of navigational links" that lead back to specific pages of the Host website:

> 20. The process of claim 17 wherein the look and feel description comprises data defining a set of navigational links, used on at least some of the web pages of the first website, each of which links link to specific web pages of the first website.

In the '399 Patent asserted against WTH, method claim 1 (A204-05) says:

1. A method of an outsource provider serving web pages offering commercial opportunities, the method comprising:
(a) automatically at a server of the outsource provider, in response to activation, by a web browser of a computer user, of a link displayed by one of a plurality of first web pages, recognizing as the source page the one of the first web pages on which the link has been activated;
   (i) wherein each of the first web pages belongs to one of a plurality of web page owners;
   (ii) wherein each of the first web pages displays at least one active link associated with a commerce object associated with a buying opportunity of a selected one of a plurality of merchants; and
   (iii) wherein the selected merchant, the outsource provider, and the owner of the first web page are each third parties with respect to one other;
(b) automatically retrieving from a storage coupled to the server pre-stored data associated with the source page; and then
(c) automatically with the server computer-generating and transmitting to the web browser a second web page that includes:
   (i) information associated with the commerce object associated with the link that has been activated, and
   (ii) a plurality of visually perceptible elements derived from the retrieved pre-stored data and visually corresponding to the source page.

Claim 3 of the '399 Patent (A205), dependent on claim 1, says:

3. The method of claim 1 wherein at least one of the plurality of visually perceptible elements includes a set of navigational links on the source page.

Claim 19 of the '399 Patent, an apparatus claim with limitations parallel to claim 1, is not quoted here. A205.

All claims of the '399 Patent require plural Merchants and Hosts and include computer technology to "recogniz[e] as the source page" which, of "a plurality of [host] web pages" belonging to different of "a plurality of web page owners," the "web browser of a computer user" has activated. Claim 1, part (a) (A204).

14

The '399 Patent claims, unlike the '572 Patent claims, also require that "the selected merchant, the outsource provider, and the owner of the first web page are each third parties with respect to one other." Claim 1, part (a)(iii) (A204).

All claims of the '399 Patent require "a plurality of visually perceptible elements derived from the retrieved pre-stored data and visually corresponding to the [Host] page." A204-05. The '399 claims do not use the term "look and feel."

### 6.    Successful '572 Patent reexamination and '399 Patent grant.

On the day that the PTO issued the '572 Patent, DDR sued units of six companies, appellants Digital River and National Leisure Group included. A122; A255, 61-64.[3] Shortly after receipt of defendants' invalidity contentions, DDR filed a reexamination of the '572 Patent and obtained a stay. A413-14. As the district court found, "the reexamination conserved judicial and party resources and it was not unreasonable or unjustified." A40.

The reexamination examiners initially rejected claims 13, 17, and 20 of the '572 Patent based on U.S. Patent 6,016,504 ("Arnold"), but the PTO Board of Appeals reversed. A1410-12. DDR's lawyer told the Board of Appeals at oral argument that the Commerce Object needed to be "the product of a merchant, meaning a third-party merchant," as opposed to being "the outsource provider's

---

[3] The suit was not a surprise: DDR had contacted appellants more than a year earlier, on account of their infringement of a parent patent. A262. The other defendants settled just before trial.

own product." A6986. The Board of Appeals recognized that DDR had argued that "Arnold's link from the host website to the merchant" did not meet the patent's definition of Commerce Object because a Commerce Object was "defined as a product of a third-party merchant, not a product sold by the owner of the linked page," *i.e.*, not an Outsource Provider's product; hence Arnold did not disclose a Commerce Object on a Host site with a corresponding link to an Outsource Provider website. A1411-12. The district court later described DDR's remarks about "third-party," in context, as supporting DDR's "premise to overcome Arnold," specifically that "the outsource provider must be independent from the host and merchant – nothing more." A2812.

While the reexamination proceeded, the PTO also examined the continuation application. The examiner granted that application after reading some 2,000 pages of Digital River-related prior art references, and the PTO issued the application on October 19, 2010, as the '399 Patent. A163; A166-67; A3325-26.

### 7. __Defendants' challenges to the patents after the stay__.

After the lawsuit resumed, the parties agreed to constructions of most claim terms, including "look and feel" from the '572 Patent and "visually perceptible elements" from the '399 Patent. The district court approved the consented-to constructions, with "look and feel" defined as: "A set of elements related to visual appearance and user interface conveying an overall appearance identifying a

website; such elements include logos, colors, page layout, navigation systems, frames, 'mouse-over' effects, or others [sic] elements consistent through some or all of the website," and "visually perceptible elements" defined as "look and feel elements that can be seen." A1062.

Concurrently with the *Markman* briefing, defendants sought to bring a summary judgment motion alleging indefiniteness from the "look and feel" claim term, but the court refused to allow the motion under a standing order allowing the court to refuse permission to bring motions plainly lacking merit. A42.

A few weeks before trial, Digital River sought to bring a summary judgment motion of non-infringement, contending that the '572 Patent could not cover DDR because each of its customers acted as both Host and Merchant. The district court permitted the motion (A1214-15), considered briefing, and held oral argument twice (A2599-607; A2857-61), but ultimately denied the motion. A2805-14.

At trial, defendants stipulated to the priority dates, for both patents, of September 17, 1998, for the independent claims, and September 17, 1999, for the dependent claims. Digital River argued at trial that its SSS prior use anticipated claims 13, 17, and 20 of the '572 Patent and that SSS obviated dependent claim 20 in combination with Tobin. Defendants dropped all other prior art defenses, including Arnold and all art mentioned in reexamination, as well as all other patents and printed publications.

17

In rebuttal, DDR's expert witness, Dr. Arthur Keller, explained at trial why SSS presented only "basically … a matching logo," not an "overall appearance" that was "'based on' the host's 'look and feel.'" A10 (citing A4563-72).

WTH conceded at trial that no prior art, SSS included, anticipates or obviates any of the claims of the '399 Patent. *See* A4610 (WTH lawyer admitting after trial, "We've put on no evidence" of invalidity). Hence, the district court granted judgment as a matter of law that the '399 Patent is not invalid based on anticipation or obviousness (or any other defense other than §101 or §112(2)). A9.

### 8. Infringement evidence presented at trial.

DDR showed at trial that Digital River's modern system, a platform called "Global Commerce," had the capability of matching overall appearance of Host web pages, unlike SSS. A4241-42, 44-46. DDR demonstrated how Digital River's "Global Commerce" platform operated for six different Host websites (and another platform for a seventh Host site). A3583-89, 94-98; A3635-39, 53-60.

Digital River did not deny that its seven web pages closely corresponded to the respective Host pages, that it controlled servers that contained data defining the "look and feel descriptions" of the Host pages, and that the Hosts needed to insert the required links leading to the correct Digital River platform pages defining the product desired by the computer user. Digital River proffered no expert witness to deny infringement.

18

As for WTH, DDR showed at trial that WTH used a single platform to service nine separate customers, each of which also have a Host web page that has a "look and feel" corresponding to the WTH platform page on which a visitor can learn about or purchase a desired cruise product. A3665-67.

DDR's expert confirmed infringement throughout the asserted infringement period by considering (1) the Internet archives (to check past "look and feel"), (2) WTH's source code (to check technical operation), and (3) WTH's single platform and changes to it. A21; A3580-82; A3665-66.

Rebutting WTH's non-infringement allegations, Dr. Keller testified that:

(1)     WTH's servers are "in Internet communication with the host web page" (claim 13 of the '572 Patent), specifically when the Host page is downloaded to the visitor computer after the visitor activates a link on the Host page (A3674-76; A3740);

(2)     WTH "controls or directs" its customers to include the links in their web pages (claim 17 of the '572 Patent), because WTH "gives the URL or link to their partners to place on their host websites for customers to access the outsource website" (A19; A3679; A4425), and because it was "technically necessary to have that link within the website in order for a visitor to go from the host webpage to the outsource website" (A3679); and

(3)     WTH "recognize[es] as the source page the one of the first web pages on which the link has been activated" ('399 Patent), by detecting a code belonging to specific WTH customers, rather than pages belonging to other Hosts (A3668; A3675-76; A3702-03).

### 9.     The verdict and subsequent procedural history.

The jury found for DDR, finding that Digital River and WTH had infringed the claims respectively asserted against them and that Digital River had not proven by clear and convincing evidence that SSS anticipated or obviated the '572 Patent. A3078-79. The jury awarded damages of $750,000 against each company, considerably less than DDR had requested. A3080.

The district court denied JMOL motions from both companies and denied Digital River's motion for a new trial, A4-35. Appellants appealed.

Appellants have not abated their infringement. DDR sued again (the Statement of Related Cases lists the suits) for damages (1) for infringement after the period for which the jury awarded damages, *i.e.*, after the "time of trial" (A3080); and (2) for infringement of another continuation patent, U.S. Patent 8,515,825, issued over appellants' prior art, including SSS.

## SUMMARY OF THE ARGUMENT

1.     The term "look and feel" does not render DDR's claims invalid for indefiniteness as "insolubly ambiguous." DDR's specification, and distinctions over

prior art, explained "look and feel" sufficiently to enable all parties and the district court to agree on the meaning of that claim term. A potential infringer can decide whether an accused website utilizes "look and feel" descriptions "based on" or "corresponding to" a Host web page by asking whether a reasonable jury would find that the accused website incorporates a "set of elements related to visual appearance and user interface conveying an overall appearance identifying a website." Such an inquiry is not subjective.

2.     The jury heard substantial evidence that the SSS prior art did not anticipate claims 13, 17, and 20 of the '572 Patent; Digital River cannot show that no reasonable jury could find that it had failed to meet its "clear-and-convincing evidence" burden. Specifically, the jury saw for itself that, before the patent's priority date, SSS did not offer visual correspondence in terms of overall appearance between Host and Outsource Provider web pages.

3.     Digital River made only passing attempts to prove factual predicates of obviousness of claims 13, 17, and 20 of the '572 Patent, and Digital River fails to discuss the facts cited by the district court as substantial evidence supporting the jury's finding that SSS combined with Tobin did not obviate dependent claim 20.

4.     DDR's comments to the PTO in reexamination of the '572 Patent, viewed in context, did not unambiguously disclaim the disclosed embodiment

where a single company, independent from the Outsource Provider, plays both the Host and Merchant roles.

5.     The asserted patent claims include material limitations directed to computer-based technology and do not cover every possible way of implementing an "abstract idea" (no matter how defined), so they meet all tests for patentability under §101 and thus claim patentable subject matter.

6.     The jury heard sufficient expert testimony, and saw visual evidence, to support its verdict of infringement, including evidence that WTH's websites (a) corresponded with its Hosts' web pages in terms of overall appearance and (b) satisfied technical requirements of specific DDR claims challenged by WTH.

7.     The district court correctly exercised its discretion to allow DDR's expert to testify about six of the nine accused WTH web pages, because WTH implemented all nine using a common platform accused timely by DDR.

8.     WTH's challenge to the damages award fails because WTH did not move for a new trial or remittitur and because the jury did not adopt DDR's "damages theory," which WTH now criticizes.

9.     The district court correctly exercised its discretion to grant the presumptive award of pre-judgment interest during a "not unreasonable or unjustified" stay of this case while the '572 Patent underwent reexamination, which the court found "conserved judicial and party resources."

22

## ARGUMENT – STANDARD OF REVIEW

Appellants appeal from the district court's denial of their respective JMOL motions (A4-35), and in the case of Digital River's SSS defenses, from its related motion for a new trial (A18; A4980). On appeals from JMOL or new trial denials, this Court applies the law of the regional circuit, in this case the Fifth Circuit. *Mettler-Toledo, Inc. v. B-Tek Scales, LLC*, 671 F.3d 1291, 1294 (Fed. Cir. 2012); *Harris Corp. v. Ericsson Inc.*, 417 F.3d 1241, 1248 (Fed. Cir. 2005).

The Fifth Circuit reviews denial of a JMOL motion *de novo* for the question of whether "the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable [jurors] could not arrive at a contrary verdict, … mean[ing] that the jury's determination must be supported by substantial evidence," and the court "must presume that the jury resolved all factual disputes in [DDR's] favor." *Transocean Offshore Deepwater Drilling, Inc. v. Maersk Drilling USA, Inc.*, 699 F.3d 1340, 1347 (Fed. Cir. 2012) (citations omitted), *petition for cert. filed,* 82 U.S.L.W. 3067 (U.S. July 6, 2013) (No. 13-43).

This Court "review[s] the denial of a motion for a new trial for abuse of discretion" and "will not reverse a denial absent a 'clear showing' of an 'absolute *absence* of evidence to support the jury's verdict." *i4i L.P. v. Microsoft Corp.*, 598 F.3d 831, 841 (Fed. Cir. 2010) (applying 5th Cir. standard) (emphasis in original) (citations omitted), *aff'd*, 131 S. Ct. 2238, 2242 (2011).

23

This Court reviews the district court's rejection of appellants' indefiniteness argument, Digital River's obviousness defense, and WTH's patentability argument *de novo* as matters of law, subject to the "presumption of validity" and "clear and convincing" evidence standards. All of those defenses, though, turn on subsidiary factual issues, which this Court reviews for "substantial evidence." *See* pp. 40, 49-50, 67*, infra.*

This Court reviews the district court's rejection of Digital River's non-infringement argument *de novo*, because it raises a claim construction question, and to decide that question, the Court determines whether Digital River has shown that DDR made a "clear and unmistakable disavowal" of claim scope. *See* p. 56*, infra.*

This Court reviews Digital River's anticipation defense and WTH's five non-infringement defenses under the "substantial evidence" standard. *See i4i*, 598 F.3d at 847-48; *Transocean*, 699 F.3d at 1356-57.

This Court reviews the district court's decisions to admit evidence, to refuse to reduce the damages award, and to award pre-judgment interest under the "abuse of discretion" standard. *i4i*, 598 F.3d at 852; *Industrias Magromer Cueros y Pieles S.A. v. La. Bayou Furs Inc.*, 293 F.3d 912, 924 (5th Cir. 2002); *Harris*, *supra; Telcordia Techs., Inc. v. Cisco Sys., Inc.*, 612 F.3d 1365, 1377-78 (Fed. Cir. 2010).

**ARGUMENT**

## I.    <u>The Infringed Claims Are Definite.</u>

The challenged claim terms ("look and feel" and "visually perceptible elements") are not indefinite because the district court approved the parties' agreed construction of those terms and because the jury could apply that agreed construction without making a purely subjective judgment. The patent specification offers ample guidance, including listing examples of "look and feel elements" and describing the purpose of "look and feel" correspondence.

Although "review of indefiniteness under 35 U.S.C. § 112, paragraph 2, proceeds as a question of law without deference, … [t]he claims as granted are accompanied by a presumption of validity based on compliance with, *inter alia*, § 112 ¶ 2." *Wellman, Inc. v. Eastman Chem. Co.*, 642 F.3d 1355, 1365-66 (Fed. Cir. 2011) (citations omitted); *see also* 35 U.S.C. §282.

Courts invalidate as indefinite only patent claims proven "not amenable to construction" or "insolubly ambiguous." *Star Scientific, Inc. v. R.J. Reynolds Tobacco Co.*, 655 F.3d 1364, 1373 (Fed. Cir. 2011) ("*Star II*") (citation omitted). "Absolute clarity is not required to find a claim term definite." *Id*.

The more common "not amenable to construction" branch does not apply here because the district court had no trouble construing the challenged claim terms. DDR, all six independent defendants (four of which settled before trial), and the

court *agreed on* a definition of "look and feel," in the context of DDR's patents. A1044; A1062. Specifically, the agreed-upon, court-ordered construction defines "look and feel" for purpose of DDR's patents as "a set of elements related to visual appearance and user interface conveying an overall appearance identifying a website …." A1062. The construction continues by listing examples, drawn from the specification. *Id*. Appellants cite no case where a court construed a claim term with consent of all parties only to hold it indefinite. *See, e.g., Wellman,* 642 F.3d at 1366 ("By finding claims indefinite only if reasonable efforts at claim construction prove futile, we accord respect to the statutory presumption of patent validity and we protect the inventive contribution of patentees ….") (citation omitted).

### a. **The term "look and feel" does not require subjective judgment.**

Nor does the "insolubly ambiguous" branch of the indefiniteness test apply. The district court characterized the jury question as whether the "look and feel" of the Outsource Provider web page is "based on" the "look and feel" or has "correspondence of look and feel" compared to the Host web page. A8; A19.[4]

---

[4] The infringed claims do not talk about "achieving" a look and feel (DR, pp. 17, 18) or having "the same" look and feel (WTH's brief ("WTH"), pp. 32, 34) or "substantially matching" (pp. 35, 36, 38). Claim 13 of the '571 Patent "define[s] the question as whether the 'look and feel' of the web pages that Digital River [or WTH] serves are '*based on*' the look and feel of the referring host site." A8 (emphasis added). Claims 17 and 20 use the phrase "*corresponding to*." A707. The '399 Patent claims use the phrase "*visually corresponding to*." A754. Appellants never argued indefiniteness of, or even asked to construe, these "degree of correspondence" claim terms.

Juries routinely decide this kind of question – *i.e.*, whether two things correspond – without their judgment being impermissibly subjective. As the district court held, "A comparison of visual elements according to the Court's construction between a pair of websites is precisely the type of infringement question for the trier of fact to decide. Such a comparison does not render the jury's decision subjective." A8; *see generally* A7-9, 28-29.

To call jury decisions about correspondence of overall appearance subjective (i) confuses infringement determination with indefiniteness, (ii) misreads *Datamize, LLC v. Plumtree Software, Inc.*, 417 F.3d 1342 (Fed. Cir. 2005), (iii) criticizes claim terms that are no more subjective than those found in large numbers of patents of unquestioned validity, (iv) insists on mathematical precision, beyond what this Court's §112(2) decisions require, and (v) suggests improperly testing the definiteness of the claim construction rather than the claim.

*First*, indefiniteness does not arise just because a jury must decide an infringement question. Many times, this Court has rejected attempts to find indefiniteness based on lack of a certain answer as to infringement of a construed claim. For example, this Court reversed a district court's holding of indefiniteness that "was based on its misunderstanding that claim definiteness requires that a potential infringer be able to determine if a process infringes before practicing the claimed process," which this Court described as an "approach" that "we

27

disclaimed" before. *Star Scientific, Inc. v. R.J. Reynolds Tobacco Co.*, 537 F.3d 1357, 1372 (Fed. Cir. 2008) ("*Star I*").

   In arguing for indefiniteness, Digital River and WTH here, like a defendant discussed in *Star I*, are "really talking about the difficulty of avoiding infringement, not indefiniteness of the claim."[5] *Id.* at 1373 (citing *Invitrogen Corp. v. Biocrest Mfg., L.P.*, 424 F.3d 1374, 1384 (Fed. Cir. 2005)); *accord SmithKline Beecham Corp. v. Apotex Corp.*, 403 F.3d 1331, 1340 (Fed. Cir. 2005) (stating that, where "the scope of this claim is clear [but] the infringement of the [defendant's] product is not," there is no indefiniteness; "[t]he test for indefiniteness does not depend on a potential infringer's ability … to determine infringement."); *Orthokinetics, Inc. v. Safety Travel Chairs, Inc.*, 806 F.2d 1565, 1575-76 (Fed. Cir. 1986) (claim term definite despite depending on a device fitting in an car door, even though "hundreds of different automobiles" have different dimensions, because "patent law does not require that all possible lengths … be listed in the patent, let alone that they be listed in the claims"); *Seattle Box Co., Inc. v. Indus. Crating & Packing, Inc.*, 731

---

[5] WTH perhaps best reveals that appellants' argument really concerns uncertainty about infringement when arguing that "there is no objective standard for determining whether a pair of web pages have [sic] the same 'look and feel' …." WTH, p. 32. Appellants likewise reveal their confusion between indefiniteness and infringement proof by contending that definiteness requires an "objective anchor" to decide whether an accused infringement meets a (well-defined) term. DR, pp. 9-10 & 16; *accord* WTH, pp. 38-41.

28

F.2d 818, 826 (Fed. Cir. 1984) (not indefinite just because defendant's "patent counsel was uncertain as to just how equal 'substantially equal to' is").[6]

Comparison-based infringement determinations do not imply subjectivity when they turn on whether two items are similar but not precisely the same. For example, in *Seattle Box,* this Court refused to invalidate a claim requiring a comparison of whether the height of "spacer blocks" was "substantially equal to the thickness of the tier of pipe lengths," reasoning, "That some claim language may not be precise, however, does not automatically render a claim" indefinite. 731 F.2d at 826. *Accord Metabolite Labs., Inc. v. Lab. Corp. of Am. Holdings*, 370 F.3d 1354, 1366 (Fed. Cir. 2004) (no indefiniteness of a claim requiring comparison of whether a level of an amino acid in a body fluid "correlate[ed]" with a deficiency of certain vitamins); *Orthokinetics,* 806 F.2d at 1575-76 (no indefiniteness for a comparison between folding chair dimensions and "the space between the doorframe of an automobile and one of the seats thereof").

Nor does subjectivity necessarily arise when infringement depends on visual observations, even by lay people. *See, e.g., Honeywell Int'l, Inc. v. United States*, 609 F.3d 1292, 1301-02 (Fed. Cir. 2010) (claim construed as requiring "perceptible to an observer" not indefinite; "'perceptible' is [not] a subjective standard"); *Apple,*

---

[6] Even appellants' lead case recognized this point. *Datamize, LLC v. Plumtree Software, Inc.*, 417 F.3d 1342, 1354 (Fed. Cir. 2005) ("indefiniteness does not depend on the difficulty experienced by a particular person in comparing the claims with the prior art or the claims with allegedly infringing products or acts").

*Inc. v. Samsung Electronics Co.*, 932 F. Supp. 2d 1076, 1081-83 (N.D. Cal. 2013) (rejecting indefiniteness despite "find[ing] no standard for measuring the precise boundaries of 'substantially centered' in the specification," because a "layman[] would tell you that visually it's by and large centered").

Under the claim language and agreed claim interpretation, the infringement question here boiled down to correspondence between Digital River or WTH pages and their customers' Host pages, in terms of overall identifying visual appearance. That jury issue raised no more subjective a question than the decisions raised by the many patent claims approved as definite.

The fact that one cannot easily predict for sure how a reasonable jury will resolve the question of whether the overall appearances of two web pages correspond does not mean that the claim requires the jury to apply "unrestrained subjective opinion." *See Exxon Research & Eng'g Co. v. United States*, 265 F.3d 1371, 1375 (Fed. Cir. 2001) ("If the meaning of the claim is discernible, even though the task may be formidable and the conclusion may be one over which reasonable persons will disagree, we have held the claim sufficiently clear to avoid invalidity on indefiniteness grounds.").

*Second, Datamize* does not demand a different result. Two district court judges agreed: "On balance, *Datamize* is distinguishable." A8855 (*see* A8841-46); A7. *Datamize* addressed a patent claim containing the phrase "desired uniform

30

aesthetically pleasing look and feel." 417 F.3d at 1345. The Federal Circuit ruled it "insolubly ambiguous" because the patentee "offered no objective definition identifying a standard for determining when an interface screen is 'aesthetically pleasing.'" *Id*. at 1350. Importantly, the *Datamize* court did not mention indefiniteness of the adjacent claim term, "look and feel." *Id*. at 1355.  By contrast, the claims here do not require a jury to apply any "aesthetic" judgment or determine whether anything is "pleasing." Appellants suggest no reason to dispute the district court's conclusion that "this Court does not find 'aesthetically pleasing' to be analogous to the concept of 'look and feel' in this case." A7.

*Third*, correspondence of overall appearance presents no more subjective a determination than the jury decisions required by the many patents whose claims contain "substantially," "about," "essentially," or similar relative terms. This Court's ample precedent upholding relative terms as definite, therefore, rebuts Digital River's contention (pp. 17-18) that "no objective test or standard for determining whether the required 'look and feel' or 'overall appearance identifying a website' exists is even possible." *E.g.*, *Deere & Co. v. Bush Hog, LLC*, 703 F.3d 1349, 1359 (Fed. Cir. 2012) ("substantially planar" not "insolubly ambiguous" even though "the claims and the specification do not explain the term"; "This court has repeatedly confirmed that relative terms such as 'substantially' do not render patent claims so unclear as to prevent a person of skill in the art from ascertaining the

31

scope of the claim."); *Enzo Biochem, Inc. v. Applera Corp.*, 599 F.3d 1325, 1331 (Fed. Cir. 2010) ("substantial interference" not indefinite despite absence of "threshold" from specification); *BJ Servs. Co. v. Halliburton Energy Servs., Inc.*, 338 F.3d 1368, 1372–73 (Fed. Cir. 2003) (claim term "about 0.06" not indefinite even though "not defined by" the specification); *In re Marosi*, 710 F.2d 799, 803 (Fed. Cir. 1983) ("essentially free of" not indefinite despite absence of numeric definition in the specification).

Relative terms appear frequently in utility patent claims for good reason. *Verve, LLC v. Crane Cams, Inc.*, 311 F.3d 1116, 1120 (Fed. Cir. 2002) ("Expressions such as 'substantially' are used in patent documents when warranted by the nature of the invention, in order to accommodate the minor variations that may be appropriate to secure the invention."); *Ecolab, Inc. v. Envirochem, Inc.*, 264 F.3d 1358, 1367 (Fed. Cir. 2001) (terms "about" and "substantially" are "commonly used in patent claims"); *Andrew Corp. v. Gabriel Elecs. Inc.*, 847 F.2d 819, 821-22 (Fed. Cir. 1988) (terms such as "approach each other," "close to," "substantially equal," and "closely approximate," "are ubiquitous in patent claims"; "Such usages, when serving reasonably to describe the claimed subject matter to those of skill in the field of the invention, and to distinguish the claimed subject matter from the prior art, have been accepted in patent examination and upheld by the courts.").

32

Moreover, correspondence of "look and feel" in terms of overall appearance coincidentally parallels the jury test for design-patent infringement. *Egyptian Goddess, Inc. v. Swisa, Inc.*, 543 F.3d 665, 677-78 (Fed. Cir. 2008) (en banc) (infringement turns on proving that "the claimed design and the accused design … would appear 'substantially the same' to the ordinary observer"; infringement can exist when an accused product has "the overall appearance" of a claimed design; overruling prior test requiring lists of specific points of similarities).[7] Accordingly, the claim terms in the infringed patents call for no more subjective of a determination than that needed to prove infringement of all design patents.[8]

*Fourth*, patents need not be drafted with exact precision, in view of the reality that reducing an invention to words involves some inevitable imprecision.

---

[7] Appellants steer clear of addressing this point on appeal. Below, they argued that the infringement tests differ, which is wrong because the standard for indefiniteness in §112(2) applies to both types of patents. *Compare* A4952; A4960 *with* 35 U.S.C. §171; *Litton Sys., Inc. v. Whirlpool Corp.*, 728 F.2d 1423, 1440-41 (Fed. Cir. 1984) ("The tests for determining the validity of a design patent … are identical to those tests … for determining the validity of a utility patent."); *Apple,* 932 F. Supp. 2d at 1084 ("The definiteness requirement applies to design patents as well as utility patents.").

[8] Holding DDR's claims indefinite because a jury could not decide infringement with sufficient objectivity seemingly would block enforcement of all unexpired design patents. *See* http://www.uspto.gov/web/offices/ac/ido/oeip/taf/issuyear.htm (700,000 design patents issued since 1843). This Court avoids decisions having such sweeping implications. *See Amgen Inc. v. F. Hoffman-La Roche Ltd.*, 580 F.3d 1340, 1373-74 (Fed. Cir. 2009) (rejecting indefiniteness argument that, "if … carried … to its logical conclusion" would make indefinite "product-by-process claims" as a whole "in instances where [that] format is often preferred").

33

For example, in *Acumed LLC v. Stryker Corp.*, 483 F.3d 800, 806 (Fed. Cir. 2007), this Court upheld as definite a claim term "curved," construed as without "sharp corners," because "a sound claim construction need not always purge every shred of ambiguity. The resolution of some line-drawing problems—especially easy ones like this one—is properly left to the trier of fact."

This Court has repeatedly repudiated the theory that claim terms must have mathematically precise boundaries that can foreordain all infringement determinations. *Enzo Biochem*, 599 F.3d at 1335 ("the claims are not indefinite even though the construction of the term 'not interfering substantially' defines the term without reference to a precise numerical measurement"); *Ecolab*, 264 F.3d at 1367 ("We note that like the term 'about,' the term 'substantially' is a descriptive term commonly used in patent claims to 'avoid a strict numerical boundary to the specified parameter.'"); *Modine Mfg. Co. v. U.S. Int'l Trade Comm'n*, 75 F.3d 1545, 1557 (Fed. Cir. 1996) ("[m]athematical precision should not be imposed for its own sake"); *see also Wellman,* 642 F.3d at 1366 ("[c]laims need not be plain on their face in order to avoid condemnation for indefiniteness") (citing *Exxon,* 265 F.3d at 1375); *TecSec, Inc. v. Int'l Bus. Machs. Corp.*, 731 F.3d 1336, 1349 (Fed. Cir. 2013) ("This court does not impose a lofty standard in its indefiniteness cases.") (citation omitted); *Star II*, 655 F.3d at 1373 (distinguishing *Datamize*: "Absolute clarity is not required to find a claim term definite.").

34

The district court properly relied on *Enzo Biochem* and *Ecolab*, A8, and Digital River's efforts (p. 26) to distinguish those cases fail. *See also* WTH, pp. 38-40 (not attempting case distinctions but making related argument). Digital River observes that *Ecolab* "did not involve the assertion of an indefiniteness defense," but *Ecolab* held that absence from the specification of "a meaningful standard against which infringement can be judged" did not require "inferring a numeric restriction" because "use of the term 'substantially' to modify the term 'uniform' does not render this phrase … unclear …." 264 F.3d at 1365, 1367. Digital River errs in trying to distinguish *Enzo Biochem* by characterizing that specification as very detailed: *Enzo Biochem* held that the district court's finding that the specification lacked detail did not matter for indefiniteness. 599 F.3d at 1331, 1335-36. In any event, DDR's specification likewise has detail. *See* part (b), *infra*.

The several decisions appellants cite, all but one being district court cases, invalidate claims as indefinite when they contain words of degree lacking precise definition.[9] The term "look and feel" does not contain words of degree; moreover, many cases show that even words of degree can be definite when construable. *E.g.,*

---

[9] DR, pp. 16, 22 & n.8; WTH, p. 31. In the lone cited Federal Circuit case other than *Datamize*, the Court found the term "fragile gel" indefinite "because it is ambiguous as to the requisite degree of the fragileness of the gel." *Halliburton Energy Servs., Inc. v. M-I LLC*, 514 F.3d 1244, 1256 (Fed. Cir. 2008). In *Halliburton* and the lower court cases, indefiniteness and subjectivity arose from claim terms not being subject to definition, which is not the case here, given the uncontested claim construction.

35

*Hearing Components, Inc. v. Shure Inc.*, 600 F.3d 1357, 1366-68 (Fed. Cir. 2010) ("readily," a "word of degree" in the claim, held definite, post-*Datamize*).

This Court's many rulings against requiring mathematical precision seem motivated by the practicalities of patent drafting. *Anchor Wall Sys., Inc. v. Rockwood Retaining Walls, Inc.*, 340 F.3d 1298, 1311 (Fed. Cir. 2003) ("while ideally, all terms in a disputed claim would be definitively bounded and clear, such is rarely the case in the art of claim drafting"); *Modine*, 75 F.3d at 1557 ("a patentee has the right to claim the invention in terms that would be understood by persons of skill in the field of the invention"); *Shatterproof Glass Corp. v. Libbey–Owens Ford Co.*, 758 F.2d 613, 624 (Fed. Cir. 1985) ("if the language is as precise as the subject matter permits, the courts can demand no more").

The Court has hesitated to demand more, to avoid over-constraining protection for inventions. *Wellman,* 642 F.3d at 1366 ("By finding claims indefinite only if reasonable efforts at claim construction prove futile, we accord respect to the statutory presumption of patent validity and we protect the inventive contribution of patentees, even when the drafting of their patents has been less than ideal.") (citation omitted); *Verve,* 311 F.3d at 1120 ("[e]xpressions such as 'substantially' [satisfy §112(2)] … and indeed may be necessary in order to provide the inventor with the benefit of his invention"); *see* U.S. Const. art. I, §8, cl. 8 (to promote the progress of the useful arts).

36

*Fifth*, patent law does not allow recursive indefiniteness attacks, where a defendant questions definiteness of words used to construe a claim term. For example, this Court criticized an indefiniteness attack as "improperly frame[d]" when based on a term used in the court's construction, rather than the claim language itself. *Honeywell*, 609 F.3d at 1302. Digital River makes such an attack by arguing (p. 17) that the agreed-to phrase "overall appearance identifying a website," in the construction of "look and feel," has no definition.

In sum, many well-established themes in indefiniteness jurisprudence support the district court's conclusion that a properly instructed jury can decide the question raised by these claims: whether two web pages correspond as to overall appearance.

### b. **The specification contains sufficient teachings.**

As the district court found, the "patent gives examples and general guidelines," A8, which suffices for definiteness. *Enzo Biochem,* 599 F.3d at 1335 ("Because the intrinsic evidence here provides a general guideline and examples …, the claims are not indefinite even though the construction of the term 'not interfering substantially' defines the term without reference to a precise numerical measurement.") (citations omitted).

*First*, appellants do not contest that the specification contains adequate written description of "look and feel" sufficient to enable one of ordinary skill in

37

the art to practice the invention. *See* A33-35 (unappealed finding that defendants waived §112(1) arguments about "look and feel").

*Second*, the fact that the parties could agree on construction of "look and feel" derives from the fact that the specification explained matters with sufficient precision to guide that construction.

*Third*, the specification:

(1)     explains the purpose of "look and feel" [*e.g.*, A149 at 3:22-24 ("Such pages give the viewer of the page the impression that she is viewing pages served by the host"); *see also* A148-49 at 2:54-3:15 (explaining certain advantages achieved by the correspondence)];

(2)     shows visual examples [*e.g.*, A136, A140 (Figs. 15, 19)]; and

(3)     identifies exemplary "elements" that make up a "look and feel": "'Look and feel elements' include logos, colors, page layout, navigation systems, frames, 'mouse-over' effects, or other elements that are consistent through some or all of a Host's website" [A154 at 14:10-14].

Disclosures of a similar nature, describing examples and explaining purpose, suffice to overcome indefiniteness challenges. *Enzo Biochem, supra; Hearing Components,* 600 F.3d at 1366-68 (the claim term "readily" held definite where specification gave examples and described purpose); *Young v. Lumenis, Inc.*, 492 F.3d 1336, 1346 (Fed. Cir. 2007) (undefined relative claim term "near" held

38

definite where specification showed examples, through figures and text); *Marosi,* 710 F.2d at 803 (no indefiniteness where specification did not define term but "provided a general guideline and examples").

*Fourth,* when obtaining the patents, applicants contrasted corresponding "look and feel" with the Tobin patent, which disclosed mere "logo-matching." A4573-80. Intrinsic evidence related to distinctions of prior art can support definiteness findings, too. *Hearing Components,* 600 F.3d at 1367 (no indefiniteness where patent "disparaged prior art" and thus taught what term "readily" is not); *Andrew,* 847 F.2d at 821-22 (no indefiniteness when claim terms "distinguish the claimed subject matter from the prior art").

The intrinsic evidence here, in sum, both (1) advises members of the public reading the patent what the term "look and feel" means, and (2) guides the jury in applying that term to decide whether two "look and feel" descriptions correspond sufficiently to support its infringement decisions. DDR's patent specification did not need to contain a precise formula or yardstick for deciding "look and feel" correspondence, any more so than the patents in various of the cases cited above needed to contain exact measured dimensions. The specification here easily passed the test established by this Court's §112(2) jurisprudence.

### c.  <u>Trial testimony did not uniformly prove indefiniteness.</u>

Appellants fail to cite any meaningful trial evidence that demonstrates that the jury needed to apply unrestrained subjectivity, rather than to follow the guidance in the claim construction and intrinsic evidence. Certainly appellants fail to demonstrate the absence of substantial evidence showing that the jury could properly decide correspondence of "look and feel."

If indefiniteness depends on such subsidiary factual issues, the standard of review would require appellants to show that no substantial evidence supported the verdict, to reverse the district court's finding "that [appellants have] failed to meet [their] burden by clear and convincing evidence to establish that the 'look and feel' claim term is insolubly ambiguous." A29 (WTH); A8 (Digital River); *Tech. Licensing Corp. v. Videotek, Inc.*, 545 F.3d 1316, 1338 (Fed. Cir. 2008) ("To the extent there are any factual findings upon which a trial court's indefiniteness conclusion depends, they must be proven by the challenger by clear and convincing evidence. Though we review the ultimate question of indefiniteness without deference to the trial court, any factual findings made by the court in a bench trial in support of that conclusion are reviewed for clear error.") (citations omitted); *BJ Servs.*, 338 F.3d at 1372 ("supported by substantial evidence" standard applied to review definiteness "issues [that] are factual in nature"). Appellants cannot meet those burdens because the trial testimony does not uniformly support their thesis.

*First*, contrary to the impression left by appellants' briefs, no DDR witness admitted in so many words that the patent claims required subjectivity. Rather, in the cited testimony, the DDR witnesses merely agreed generally that someone – whether themselves or more importantly the jury – needed to apply observational skills to see whether two web sites correspond in terms of overall appearance. But such neither admits indefiniteness nor creates a uniform body of evidence requiring a finding that no substantial evidence supports the definiteness judgment.

*Second*, appellants read too much into specific pieces of cited testimony:

• Appellants rely on testimony by four co-inventors summarizing in general terms the purpose of "close" matching, which they thought useful in 1998 to further Nexchange's business goals. DR, pp. 7-8; WTH, pp. 32-33. Inventor overviews of their inventions, though, do not prove that the jury applied impermissible subjectivity, just as the district court held. A28.

• Appellants emphasize inventor testimony about "real look and feel," but that does not show subjectivity, because appellants incorrectly paint this as some kind of inventor admission that the claims require the jury to distinguish "real" from "fake" look and feel. DR, pp. 21-22, WTH, pp. 32-33. Rather, the inventor (echoing DDR's opening argument) merely used the catch-phrase "real look and feel" as shorthand for the agreed-upon construction of "look and feel,"

41

namely the "overall appearance identifying a website" (A1062), as opposed to the logo-only prior art distinguished in prosecution. A3149, 52-54; A3206, 09, 16.

• Appellants cite Dr. Keller's opinions that the website pairs "to [his] eyes" had "the same look and feel" despite not being a "perfect match" and matched as closely as his "twin girls." DR, pp. 19-20; WTH, pp. 33-34. Dr. Keller's reference to "[his] eyes" likewise did not admit subjectivity of his investigation; rather it just tracks Dr. Keller's unsurprising view that the jury's opinion, not his, controls. A3754.

*Third*, Digital River did not show subjectivity through its own witnesses' competing proposal that the test for corresponding appearance depends on Digital River customers (*i.e.*, Hosts) applying their "subjective beliefs" to determining whether websites had close enough correspondence to accomplish their business goals. DR, pp. 18, 32. Nothing required the jury to accept that proposal, especially given its conflict with the intrinsic evidence instructing that overall appearance to the user, not business aims of the Host, determines "look and feel" correspondence. A1062 ("overall appearance" in claim construction); A149 at 3:22-24 ("look and feel" correspondence depends on the effect on "the viewer of the page").

*Fourth*, WTH argues for subjectivity by alleging (pp. 34-38) that Dr. Keller made "inconsistent infringement contentions." The district court made a directly contrary factual finding: "The Court does not find Dr. Keller's testimony to be

42

inconsistent." A29. WTH fails to show an absence of substantial evidence supporting the finding of "no inconsistencies." Notably, WTH's alleged inconsistencies relate to comparisons between examples that Dr. Keller opined infringed with examples as to which Dr. Keller had not reached conclusions, or as to which DDR had withdrawn infringement allegations. A3730. WTH continues to argue (p. 35), wrongly, that the fact that "DDR did not charge" certain websites with infringement means that DDR "presumably admit[ed]" they did not infringe.

In any event, inconsistent testimony from an expert does not prove indefiniteness. *Praxair, Inc. v. ATMI, Inc.*, 543 F.3d 1306, 1321 (Fed. Cir. 2008) ("Even if we were to agree that [an expert] was unable to reach a single consistent construction of the [claim term], such extrinsic evidence would not prove the … patent invalid [for] indefiniteness").

"[P]roof of indefiniteness must meet an exacting standard." *Wellman,* 642 F.3d at 1366 (citations omitted). To show indefiniteness, "an accused infringer must demonstrate by clear and convincing evidence that one of ordinary skill in the relevant art could not discern the boundaries of the claim based on the claim language, the specification, the prosecution history, and the knowledge in the relevant art." *Id* (citations omitted)*.* Appellants fail to meet that exacting standard.

## II. **The Jury Heard Substantial Evidence to Support Its Finding That Digital River Had Not Proven Anticipation of the '572 Patent from Its "Secure Sales System" by Clear and Convincing Evidence.**

Evidence that the SSS system did not display a website with a "look and feel" corresponding to that of the Host website, according to the court's construction, supports the jury finding that the SSS system fails to anticipate the three asserted claims of the '572 Patent. A3079. Digital River bears the burden of proving anticipation by "clear and convincing evidence."[10] *See Microsoft Corp. v. i4i L.P.*, 131 S. Ct. 2238, 2242 (2011). Anticipation arguments raise questions of fact. To reverse the jury verdict, Digital River must show "no substantial evidence" to support it, *i4i,* 598 F.3d at 848, which Digital River cannot do.

As an initial matter, Digital River (pp. 33-34) concedes that DDR's expert testimony "would be competent evidence against anticipation," but Digital River argues that the expert's opinion can somehow be disregarded as "his purely subjective belief." That is incorrect as discussed above; moreover, Digital River's argument makes clear that its anticipation argument depends on its indefiniteness argument: If the Court affirms the "no indefiniteness" ruling, affirmance of the "no anticipation" finding should follow automatically.

---

[10] WTH did not adopt Digital River's anticipation defense or seek to extend it to prove anticipation of the '399 Patent, which has claims containing extra elements not found in the asserted claims of the '572 Patent.

44

That concession aside, DDR presented "substantial evidence" against anticipation. First, the jury saw and heard evidence that, during the prior art period, SSS did not display corresponding "look and feel" of a Host web page, as the claims require – in the sense of the claim construction, which demands "conveying an overall appearance identifying a website …." A1062. Instead SSS displayed "basically … a matching logo." A10. Evidence to that effect included:

(1)     Dr. Keller's expert testimony that the SSS pages did not have corresponding "look and feel" to the respective Hosts in terms of overall appearance. A4563-72.

(2)     Pairs of web pages shown to the jury. *Compare* A7502 *with* A7494 (Digital Frontiers/SSS pages); A6122 *with* A8858-61 (Miramar/SSS pages).

(3)     Dr. Keller's testimony that SSS "is no better than Tobin," A4580 (the prior art that the PTO considered when granting the '572 Patent, A4578), and that Tobin does not teach correspondence of "look and feel" in terms of overall appearance. A4573-80. Contrary to Digital River's contention (p. 34), therefore, DDR's expert applied objective criteria to support his opinion that SSS did not reproduce corresponding overall "look and feel" appearances; he used intrinsic evidence, related to a distinction of other prior art found in the file history.

Next, the jury heard evidence from Digital River's vice president, Mr. Gagliardi, that SSS could not display corresponding overall "look and feel" of a

Host web page because of certain technical constraints of the underlying platform, which allowed SSS to display little more than the logo, and even the logo with some difficulty – the logo's placement on the page would correspond to the Host only coincidentally or by using a "hack." A3472-75; A4244-48.[11]

Digital River argues (p. 32) that the expert testimony distinguished SSS from the claims without considering the district court's actual construction. To the contrary, Dr. Keller testified explicitly that the SSS web page pairs did not meet the court's claim construction. A4572; A4563-64; A4565 (showing the jury the court's claim construction and comparing to SSS); A4566-67 (Miramar site pair, relied on by Digital River, p. 31, does not match, under the court's claim construction); A4567 (same for Digital Frontiers pair).

Digital River further argues (p. 32) that the district court ignored its own construction and (p. 33) that "the district court failed to tie" the evidence about "system constraints" to a specific missing claim limitation. To the contrary, the district court held, "The jury considered such evidence, including the pairs of websites that Digital River displayed, and evidently found no *corresponding overall look and feel* to render the '572 patent invalid in light of the SSS system." A10 (emphasis added). The district court indeed referred to its construction and to the missing limitation: corresponding "look and feel."

---

[11] The jury also considered a plethora of Digital River documents and saw a live demonstration of a reconstructed system (*e.g.*, A4836).

The jury evaluates credibility, and it had the right to credit the admissions of Digital River's witness and the opinion of DDR's expert; the jurors could see for themselves that the closest website pairs that Digital River could muster, for the SSS system in the relevant time period, involved little more than logo matching and did not meet the claims, as the court construed them to demand correspondence of overall appearance.

Digital River never could show that its SSS system ever replicated the overall appearance of any Host site, so SSS does not anticipate.

## III. The Jury Heard Substantial Evidence to Support Its Finding That Digital River Had Not Proven Obviousness of the '572 Patent from Its "Secure Sales System" by Clear and Convincing Evidence.

Substantial evidence rebuts Digital River's "SSS-only" obviousness argument, which Digital River presented in a way that can be described as skeletal at best. Substantial evidence also rebuts Digital River's attempt to show obviousness of claim 20 of the '572 Patent by the combination of SSS and Tobin.[12]

### a. Substantial evidence supports the jury's non-obviousness finding.

Digital River's JMOL motion said just this: "[T]he Asserted Claims are invalid as obvious in view of the Digital River SSS System." A4836. The JMOL motion offered no explanation of that statement and cited no evidentiary support. Digital River did not present any argument explaining what it now calls its *prima*

---

[12] As with anticipation, the court granted JMOL that the '399 Patent is not invalid based on obviousness, A4610, and WTH does not challenge that ruling on appeal.

*facie* case of obviousness over SSS alone, including no mention of the specific obviousness arguments found in its appeal brief at pages 36-37 about its supposed financial motivations or its customers' supposed reactions. A4834-39.[13]

Digital River (p. 37) criticizes the district court for not having "specifically addressed" Digital River's SSS-only argument. The district court found "that substantial evidence supports the jury's verdict that the asserted claims are not invalid as anticipated or *obvious in light of the SSS System* and/or in light of the combination of the SSS System and the Tobin patent." A11 (emphasis added). In other words, the district court rejected Digital River's argument with specificity matching Digital River's presentation. Digital River also argues (p. 37) that DDR "failed to present any evidence controverting" the supposed SSS-only case, but it is hard to blame DDR for failing to rebut an argument never developed.[14]

---

[13] DDR argued in response to Digital River's renewed JMOL motion that Digital River had "offered no testimony at all regarding obviousness of claims 13 or 17 of the '572 Patent," A4900. Even thereafter, Digital River cited no evidence. A4962-63 (JMOL reply). Digital River's other motions were equally sketchy: It failed to mention SSS-only obviousness at all during its in-trial, oral JMOL motion, and its written Rule 50(a) and 59 motions alluded to Digital River exhibits and witnesses generally, argued that SSS disclosed all elements (*i.e.*, anticipation), and cited a similarly offhand remark in Digital River's closing argument. A4612-13; A3020-21, 40-41; A4987.

[14] This Court has the power to ignore new arguments. *Fresenius USA, Inc. v. Baxter Int'l, Inc.*, 582 F.3d 1288, 1295-96 (Fed. Cir. 2009) ("If a party … presents only a skeletal or undeveloped argument to the trial court, we may deem that argument waived on appeal, and we do so here."). Given the unfairness to DDR of this argument having been raised only on appeal, the Court should do so.

The district court found that "Digital River did not meet [its] burden to show obviousness by clear and convincing evidence." A11. Digital River offers no reason to overturn that finding because (1) it presented no expert testimony[15] and virtually no evidence at all supporting SSS-only obviousness, much less "clear and convincing evidence"; and (2) the jury was not obligated to accept Digital River's current SSS-only obviousness theory, which relies on a scrap of evidence about customer satisfaction, given contrary evidence of customer dissatisfaction.

Digital River has the burden of proving obviousness by "clear and convincing evidence." *See Microsoft*, 131 S. Ct. at 2242. Obviousness presents subsidiary factual questions for the jury to decide. A4673-76 (jury charge listing factual questions); *i4i*, 598 F.3d at 845 ("obviousness … is based on factual underpinnings"); *Kinetic Concepts, Inc. v. Blue Sky Med. Group, Inc.*, 554 F.3d 1010, 1019–21 (Fed. Cir. 2009) ("Defendants' obviousness argument at trial relied heavily on the prior art references, the scope and content of which are factual questions to be determined by the jury.") (citations omitted); *Tec Air, Inc. v. Denso Mfg. Mich. Inc.*, 192 F.3d 1353, 1359 (Fed. Cir. 1999) (applying 5th Circuit standard and affirming denial of JMOL; "factual underpinnings" of obviousness "include what a prior art reference teaches," and "we … presume that the jury resolved the underlying factual disputes in favor of the verdict winner and leave

---

[15] Digital River's invalidity expert failed to testify on this subject. A4342-43. Accordingly, DDR's validity expert did not rebut it. A4580-82.

those presumed findings undisturbed if they are supported by substantial evidence")

(citations omitted).

To support its supposed *prima facie* obviousness case, Digital River cites (at p. 36) only one piece of evidence: that its clients supposedly "were satisfied with the degree of 'look and feel' stored and served by Digital River." But that does not signal obviousness of DDR's invention – to the contrary, if Digital River's clients found SSS satisfactory, that would suggest the absence of motivation to add DDR's improvement. In any event, even if evidence of client satisfaction had any bearing, substantial contrary evidence existed, in the form of a Digital River client who was so dissatisfied that he used "salty," critical language. A4198-201; A7106-07.

Evidence contravening obviousness also existed in the form of testimony of Nexchange's commercial success attributed to use of the invention, which the jury heard, through an unchallenged instruction, could influence its obviousness verdict. A3223-24; A3235; A3339; A3350; A3378; A3541-42; A4675.

Digital River fails to show any evidence of obviousness, much less clear and convincing evidence, and much less the absence of any substantial evidence to rebut the presumption, *Tec Air, supra*, that the jury resolved underlying factual disputes in favor of DDR when issuing the non-obviousness verdict.

**b. <u>Substantial evidence supports the jury's finding that SSS combined with Tobin did not make dependent claim 20 obvious.</u>**

Digital River (p. 37) labels "SSS combined with the Arnold patent" as "an alternative theory argued at trial" for obviousness of claim 20 of the '572 Patent. Actually, Digital River relied on SSS combined with *Tobin*. A10.

Digital River briefly mentions claim 20 (pp. 37-38) but does not discuss the evidence supporting non-obviousness on which the district court relied to rule that the jury heard substantial evidence to support its decision to reject Digital River's defense.[16] Thus, Digital River fails even to try to rebut the presumption that the jury resolved factual disputes about the content of SSS and Tobin in favor of DDR, so no ground for reversal exists. *See Tec Air*, *supra*.

In any event, substantial evidence – including testimony about the absence of any motivation to combine SSS and Tobin, at least – supports the jury's refusal to find claim 20 obvious. A4581-82 (cited by district court, A10-11). Digital River never denies that such evidence existed.[17]

_____

[16] Although it argued a claim 20 obviousness theory below, on appeal, Digital River explicitly alleges error just for the SSS-only theory. *See* DR, pp. 2, 10, 34.

[17] Digital River merely cites (p. 38) testimony by its expert Mr. Kent, A4343, in turn quoting a Digital River employee who said that adding links would have been "easy." But Mr. Kent never testified why it would have been logical for an ordinarily skilled artisan to have added links, however "easy." Even if this could be thought of as one piece of evidence of obviousness, which it is not, reversal requires more: Digital River must show the absence of substantial contrary evidence.

51

IV. **DDR Did Not "Disclaim" Patent Coverage for Scenarios Where the Host and Merchant Are a Single Business Entity That Is a Third Party to the Outsource Provider.**

The district court acted properly in clarifying its claim construction just before trial, and the clarification correctly held "that infringement [of the '572 Patent] is possible" by Digital River customers who control both Host and Merchant, because DDR's specification disclosed scenarios "where the e-commerce outsource provider is independent from the host and merchant, regardless of whether the host and merchant are controlled by the same entity or separate entities," and because DDR never made a "clear and unmistakable disavowal" of one of those scenario during reexamination of the '572 Patent. A2813-14.

a. **The district court had the power to clarify its claim construction, so any inconsistencies with its earlier *Markman* rulings do not matter.**

The district court's pre-trial ruling is not subject to attack for "constru[ing]" the "agreed construction" improperly (DR, p. 44), because the law allows a district court to clarify its prior claim-construction order, or even change it entirely, in advance of trial. *Pressure Prods. Med. Supplies v. Greatbatch Ltd.*, 599 F.3d 1308, 1315-16 (Fed. Cir. 2010) ("it was proper for the trial court" to "supplement the *Markman* order by clarifying the meaning of" of a claim through a "late adjustment"); *Utah Med. Prods., Inc. v. Graphic Controls Corp.*, 350 F.3d 1376, 1381-82 (Fed. Cir. 2003) (holding that the district court did not err in amending its

claim construction during oral arguments for pretrial motions nearly two years after the original construction).

That disposes of the bulk of Digital River's arguments (*see* pp. 42-47, 53), all of which rely on alleged inconsistencies: (1) a chart inserting into the claim language the construction of individual terms (p. 43); (2) implications of DDR's agreement to individual term definitions (p. 44); and (3) a dictionary definition of "third party,"[18] in combination with the terms (pp. 45-46). Contrary to all three arguments, the proven infringement meets the *Markman* constructions of each of the claim terms.[19] The district court acknowledged Digital River's arguments but found no inconsistencies, A2807-08, and proceeded to consider the issue "as a matter of claim construction," A2813, straightforwardly.

---

[18] Digital River mischaracterizes the dictionary definition as a *DDR* "propos[al]" in the *'399* Patent (p. 45). The dictionary came from Digital River, which produced it to DDR in this lawsuit, causing DDR to cite it in a pending continuation application; indeed, not in the application leading to the '399 Patent at all. *Compare* serial numbers and dates of A1339 (cited on p. 45) with A163 ('399 Patent).

[19] In brief, (1) Microsoft (an example client of Digital River) is a Host, *i.e.*, "An operator of a website that engages in Internet commerce by incorporating one or more links to an e-commerce outsource provider [Digital River] into its web content"; (2) Microsoft is also a Merchant, *i.e.*, "a distributor, or reseller of goods or services to be sold"; (3) Digital River is an Outsource Provider, *i.e.*, "A party, independent from the host associated with the commerce object or merchant of the commerce object [Microsoft], that provides e-commerce support services between merchant(s) and host(s)"); and (4) Digital River's sites support sale of Commerce objects, *i.e.*, "A third-party merchant's [Microsoft's]: catalog, category, product (goods or services), or dynamic selection." Moreover, even "construing the construction," (5) Microsoft and Digital River are "third parties" to one another, *i.e.*, "separate legal entities under separate control." A1062.

53

### b. __The district court properly construed the claims asserted against Digital River as covering the scenario "where one party plays the dual role of Host and Merchant," disclosed by the specification.__

The district court correctly ruled that the '572 Patent did not require that different companies act as Host and Merchant. The claims, the specification, and the file history all support the district court's ruling.

1.    The claims. Claims 13, 17, and 20 of the '572 Patent have no express limitation such as that found in the '399 Patent, namely: "wherein the selected merchant, the outsource provider, and the owner of the first web page *are each* third parties with respect to one other." A204 (emphasis added). For that reason, DDR asserted the '572 Patent and not the other patent against Digital River. Contrary to its brief's suggestion (p. 42), therefore, Digital River's argument does not rely on "express and unambiguous language" of the '572 Patent's claims.

2.    The specification. The '572 Patent states that the Merchant and Host can be a single business entity. A159 at 23:13-14 ("This folds into two parties where one party plays the dual role of Host and Merchant"). The district court rightly viewed that specification, which is the "single best guide to" and touchstone of claim construction, as proof that DDR's inventors understood and disclosed this specific embodiment. A2810, 13. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1315, 1316 (Fed. Cir. 2005) (en banc); *SanDisk Corp. v. Memorex Prods., Inc.*, 415 F.3d

1278, 1287 (Fed. Cir. 2005) ("A claim construction that excludes a preferred embodiment, moreover, is rarely, if ever, correct") (citation omitted).

Digital River's brief (p. 48) focuses on the irrelevant questions of whether DDR's specification "treats" the Host and Merchant as "separate entities" in some places, discusses one embodiment more than another, or discusses certain "benefits" applicable only to one scenario. The relevant inquiry is just whether the specification also describes an embodiment "where one party plays the dual role of Host and Merchant," which it clearly does. A159.

Digital River also argues (p. 53) that it cannot be an "intermediary" between a Host and a Merchant if those parties are the same entity. The district court rightly rejected such argument as a matter of logic. A2813; *see also* A2246 n.1 (DDR explanation, unrebutted later, that Microsoft pays Digital River to act as "intermediary" selling body, which aids Microsoft in view of its large number of web pages and large number of products).

3.    The prosecution history. DDR did not disclaim the disclosed embodiment during the '572 Patent's reexamination. A prosecution history "often lacks … clarity of the specification and thus is less useful for claim construction." *Phillips,* 415 F.3d at 1317 (citing cases refusing to limit construction based on "ambiguity of the prosecution history"). Digital River could show error only if DDR's lawyer had made a "clear and unmistakable disavowal" of the disclosed

"two-party" scenario. *Aria Diagnostics, Inc. v. Sequenom, Inc.*, 726 F.3d 1296, 1302 (Fed. Cir. 2013).

The district court correctly addressed this question, holding that, viewed in the proper context, DDR's lawyer made no clear disclaimer: "[T]he Court reaffirms that context matters. Reading the full reexamination file as opposed to the isolated statements cited by Digital River takes this reader to a different conclusion" than what Digital River proposed. A2813.

> The district court took care to explain the context in detail:

> DDR's statements distinguishing Arnold on the basis of a "third-party" were directed to the overriding concept that an "outsource provider" must be independent from both the Merchant and the Host, i.e., a "third-party." While the isolated statements made by DDR before the USPTO initially appear to support Digital River's arguments for prosecution history estoppel, Digital River's arguments lose much of their persuasive force when read within the full context of the reexamination file. Within the context of the entire dialogue between DDR and the USPTO, it becomes apparent that DDR did not limit the claims to require three separate parties or entities, but rather DDR laid out a different premise to overcome Arnold, i.e.: that the outsource provider must be independent from the host and merchant – nothing more.

A2812. The district court explained the context accurately, and Digital River's brief offers no rebuttal; Digital River never explains its assertion (p. 52) to the contrary.

As for the statements allegedly disclaiming the embodiment, Digital River's brief relies heavily (pp. 50, 51) on oral argument in the PTO appeal, where DDR referred to "third-party merchant." A6986-89. The district court already explained

the context of that remark, A2812, namely, it closely followed another statement

where DDR's attorney explained what he meant by "third-party merchant":

> [W]e are advocating for the commerce object being the product of a
> merchant, meaning a *third-party merchant*. If you don't do that and
> you say the commerce object can be the *outsource provider's own
> product, then, which is, in effect, what the Examiner has said*, then it
> would make no sense ….

A6986 (emphasis added). Thus, DDR's attorney first provided the context, which

makes it clear that, when he used the term "third-party merchant" just moments

later, in the remark Digital River cites, he meant "third party" in the sense that the

"merchant" must differ from the "outsource provider." Yet, again, Digital River's

brief offers no rebuttal.

Digital River (p. 51) cites other "isolated statements" from other parts of the

reexamination file, from DDR's written remarks, removing the context each time.

*See* A1371 (distinguishing Arnold because of the "absence of an 'outsource

provider'" that is "independent," because the alleged "host" in Arnold "link to

'merchants' directly and not to any 'outsource provider'"; thus, the Digital River-

cited quotations from the next page, about "wrong number of parties" and "three

parties," refer to the absence of an Outsource Provider independent from the Host);

A1390 ("'commerce objects' … are … products of third-party merchants, and the

'second website' is at an 'outsource provider' site, not a merchant site"; again

making clear that the Merchant is a third-party to the Outsource Provider and "three

57

parties" means that one cannot drop the Outsource Provider); A6941 ("the term 'commerce object' is the product of a third-party Merchant being viewed on the 'outsource provider's' site"; again making it clear that "third-party merchant" means independent from the "outsource provider").[20]

Finally, Digital River (pp. 49, 53) argues that DDR needed to disclaim the disclosed scenario of a single entity serving as both Host and Merchant to "salvage its claims," allegedly in "mortal jeopardy." Contrary to Digital River's new theory (p. 53) that DDR argued broadly for safety's sake, DDR simply had no occasion to discuss the relationship between Host and Merchant – the issue that controls the current question – during the reexamination; the argument centered around the independence of Merchant and Outsource Provider, or put another way, whether any Outsource Provider, or any Commerce Object, existed at all.[21]

At each turn, DDR explained the specific distinction it needed to make, then referred to that specific distinction with captions and summaries using the words "three parties" and "third parties." In doing so, DDR did not "clearly and

---

[20] Digital River also relies on (p. 49) – indeed begins with – a quote from DDR distinguishing a different reference, from IBM, A939, but it never argued DDR's distinction of IBM in its summary judgment or JMOL motions, so it waived this. In any event, the IBM comment similarly referred to "two websites," namely a "host" site that linked directly to a "merchant" site, with no "outsource provider" at all. *Id*.

[21] The PTO's decision (A1411-12) relied on DDR's argument (see above) that Arnold lacked an Outsource Provider, independent from the Host and Merchant, and rather disclosed a link from Arnold's "VO" site directly to a Merchant (like other prior art) not to an Outsource Provider selling someone else's products.

unmistakably" disclaim a scenario, explicitly disclosed in its specification, that it had no reason to discuss at all.

At most, one might conclude that DDR's summary statements or oral argument "lack[ed] clarity" on the subject at issue here, but the fact that the district court could disagree with Digital River, after taking care to consider the file history statements "in context," alone shows the absence of any "clear and unmistakable disavowal" required by controlling precedent. *Aria,* 726 F.3d at 1302; *Phillips,* 415 F.3d at 1317.

This Court should defer to the district court's decision about the scope of the disclaimer, or at least give it great weight, because it is a question that is substantially factual in nature, and because the district court studied seven briefs on this subject, reviewed many exhibits, and conducted two oral arguments. *See Lighting Ballast Control LLC v. Philips Elecs. N.A.*, Nos. 2012-1014, -1015 (Fed. Cir. 2013) (pending en banc). Even if the *Lighting Ballast* Court reaffirms existing standards, this Court affords weight to district court claim construction rulings, even on *de novo* review, when the district court has taken care to study the record carefully. *Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448, 1458-59 (Fed. Cir. 1998) (en banc) (accepting the trial court's claim constructions); *id.* at 1462 (Plager, J. concurring) (explaining that the trial judge's view "will carry weight," which "may vary depending on the care, as shown in the record, with which that view was

developed, and the information on which it was based"); 138 F.3d at 1463 (Bryson, J. concurring) (similar); *id*. at 1478 (Rader, J. concurring) (urging "more deference to trial court claim interpretations, particularly in complex cases" and "where appropriate"); s*ee Salve Regina Coll. v. Russell*, 499 U.S. 225, 232 (1991) ("an efficient and sensitive appellate court at least will naturally consider [the district court's] analysis in undertaking its [independent] review"); *Key Pharm. v. Hercon Labs. Corp.*, 161 F.3d 709, 713 (Fed. Cir. 1998) ("we do not start from scratch; rather we begin with and carefully consider the trial court's work").

## V.     The '572 and '399 Patents Claim Patentable Subject Matter.

WTH, but not Digital River, contends on appeal that the infringed claims fall into the category of "abstract ideas" instead of patentable inventions. 35 U.S.C. §101. To the contrary, the asserted patents claim patentable subject matter under this Court's tests, so these patents do not present a close case.

Neither the Supreme Court[22] nor the Federal Circuit has established any litmus test for when a patent claim covers an "abstract idea," but this Court sat en banc this year to evaluate that question in *CLS Bank International v. Alice Corp.*, 717 F.3d 1269, 1326 (Fed. Cir. 2013) (en banc), *cert. granted*, 82 U.S.L.W. 3131 (U.S. Dec. 6, 2013) (No. 13-298). WTH fails to discuss that decision.

---

[22] The Supreme Court in *Bilski v. Kappos*, 130 S. Ct. 3218, 3227 (2010), rejected various tests but did not say specifically why Bilski's patent was "abstract."

60

*CLS Bank* articulated three tests: The lead opinion, supported by five judges, applied a "preemption analysis." Four judges applied a "meaningful limitations" test, although they issued opinions having different results for the claims then at issue. One judge (with some support from a supplemental opinion) argued that "machines" or "processes" fall in the statutory categories and cannot be "abstract ideas." The claims here satisfy all three tests.

1.    The lead opinion in *CLS Bank*, 717 F.3d at 1273 *ff.* (Lourie, J.), establishes a "preemption analysis," *i.e.*, "that claims should not be coextensive with [an] abstract idea"; a claim cannot "subsume the full scope of a fundamental concept." *Id*. at 1281. To meet that test, a claim "must include one or more substantive limitations that … add 'significantly more' to the basic principle …." *Id*. "[O]ne cannot meaningfully evaluate whether a claim preempts an abstract idea until the idea supposedly at risk of preemption has been unambiguously identified." *Id*. at 1282.[23] Once having identified the abstract idea, the court should determine whether the added limitations are enough to avoid preemption. *Id*. In doing so, courts consider whether the added limitations are merely "insignificant,

---

[23] *Ultramercial, Inc. v. Hulu, LLC*, 722 F.3d 1335, 1343 (Fed. Cir. 2013), suggests that "an abstract idea is one that has no reference to material objects or specific examples" and thus typically fails the "machine-or-transformation" test. The district court here found that the asserted claims easily qualify as "machines," a finding that WTH does not challenge. A27-28.

conventional, or routine," although "that language [should not] be confused with novelty or nonobviousness analyses." *Id*. at 1284.

Although not citing *CLS Bank*, WTH repeatedly alleges (pp. 19, 23-24, 28) that the claims here "preempt abstract ideas" or cover "all possible ways" of implementing an abstract idea.[24] The claims here easily pass the "preemption" test.

WTH's argument (pp. 19, 20, 26) characterizes the "idea" simply by referencing the inventors' testimony at trial concerning what they "invented." But the abstract idea should be defined by studying how the inventors defined the idea in the patent itself, not how they characterize it years later, as they often do in short trials, by describing the "gist" or "core idea." A28; *Aro Mfg. Co. v. Convertible Top Replacement Co.,* 365 U.S. 336, 345, (1961) ("[T]here is no legally recognizable or protected 'essential' element, 'gist' or 'heart' of the invention."); *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 132 S. Ct. 1289, 1293 (2012) ("[T]oo broad an interpretation of [the 'abstract idea' exception to §101] could

---

[24] *Accenture Global Services, GmbH v. Guidewire Software, Inc.*, 728 F.3d 1336 (Fed. Cir. 2013), cited by WTH (pp. 17, 18, 25, 27), applied (by a 2-1 vote) preemption analysis, but it is clearly distinguishable: The court held system claims invalid because they did not materially differ from method claims that the patentee had admitted violated §101, *id*. at 1342, and the only argued limitations, to "a computer environment and within the insurance industry," did not "avoid preempting," *id*. at 1345. The district court below correctly held that, "When the asserted claims are considered as a whole, the claimed invention lies in stark contrast to the facts of" a pre-*CLS Bank* case cited by WTH (p. 25) with facts similar to *Accenture*, that is, *Bancorp Services, L.L.C. v. Sun Life Assurance Co. of Canada (U.S.)*, 687 F.3d 1266, 1276-77 (Fed. Cir. 2012).

eviscerate patent law. For all inventions at some level embody, use, reflect, rest upon, or apply laws of nature, natural phenomena, or abstract ideas"); *Ultramercial, Inc. v. Hulu, LLC,* 722 F.3d 1335, 1344 (Fed. Cir. 2013) ("The Court has long-recognized that any claim can be stripped down, simplified, generalized, or paraphrased to remove all of its concrete limitations, until at its core, something that could be characterized as an abstract idea is revealed.").

The claims have plain limitations preventing preemption of the "abstract idea," however defined. Claim 13 of the '572 Patent requires specific stored data and Internet communication to remote web pages; claim 17 of the '572 Patent and the '399 claims require service of a two-part "composite web page" on the basis of "activation of [a] link" from another computer. As the district court properly found, the system claims require "a specific set of physical linkages, including, coupling between the data store and the processor, the data store storing a look and feel description associated with a host web page and the processor programmed in certain ways to serve a composite web page," and the process claims "require[] a similar interaction between a data store storing a look and feel description of a web page and an activation of a link from a visitor computer to receive a composite web page," as well as "a server that responds to activation by a web browser of a computer user by retrieving pre-stored data from storage, then generating and transmitting visual elements corresponding to the source page." A26-27.

Moreover, WTH undercuts its preemption argument by alleging non-infringement (pp. 45-58) on account of allegedly absent technical limitations despite practicing the abstract idea that it identifies. Even if WTH's non-infringement arguments are wrong, *see* part VII, *infra*, they prove that the claims do not preempt or cover all ways to practice the abstract idea. In similar vein, in the damage part of the case, WTH argued non-infringing alternatives. A4393-99; A4513-14. The claims cannot possibly preempt all ways of practicing the abstract idea when WTH could argue for non-infringement and gain concessions on damages by arguing the presence of non-infringing alternatives.[25]

WTH downplays all narrowing limitations as "generic functionalities" or "conventional computer techniques" (pp. 18-19, 25-28), but WTH offers no proof of those assertions.[26] The Supreme Court has squarely rejected WTH's form of analysis. *Diamond v. Diehr*, 450 U.S. 175, 188 (1981) ("It is inappropriate to dissect the claim into old and new elements and then to ignore the presence of the old elements in the analysis. This is particularly true in a process claim because a

---

[25] Proof that the '399 Patent does not preempt is also found in the fact that Digital River does not infringe it, even though Digital River matches the "look and feel" of its Hosts (the abstract idea proposed by WTH).

[26] The only argument WTH presents for preemption (at pp. 21-22) contends that preemption exists because DDR made "selective" infringement accusations. But logic seems absent: Even assuming WTH correctly characterized what DDR had done, accusing some sites and not others tends to show an absence, not the presence, of preemption.

new combination of steps in a process may be patentable even though all the constituents of the combination were well known and in common use before the combination was made. The 'novelty' of any element or steps in a process, or even of the process itself, is of no relevance in determining whether the subject matter of a claim falls within the §101 categories of possibly patentable subject matter.").

2.      The second test in *CLS Bank*, 717 F.3d at 1292 *ff.* (Rader, C.J.), the "meaningful limitations" test, considers whether a claim limits its scope to "an application, rather than merely an abstract idea." *Id*. at 1299.[27] Claims that "cover all possible ways to achieve the provided result" fail the test. *Id*. at 1301. *Ultramercial* elaborated on the "meaningful limitations" test by clarifying that computer/Internet limitations can still be "meaningful": claims "directed to a *specific computer* for doing something" or "tied to a computer in a specific way" do not preempt abstract ideas. 722 F.3d at 1348-49 (emphasis in original); *accord CLS Bank,* 717 F.3d at 1302; *SiRF Tech., Inc. v. Int'l Trade Comm'n*, 601 F.3d 1319, 1333 (Fed. Cir. 2010) (where the "addition of a machine … play[s] a significant part in permitting the claimed method to be performed, rather than function[ing] solely as an obvious mechanism … for performing calculations," the limitation renders the method patent-eligible); *In re Alappat*, 33 F.3d 1526, 1544-45 (Fed. Cir. 1994) (claims directed to a "combination of interrelated elements,"

---

[27] The third and fourth opinions apply the same test but reach different outcomes. 717 F.3d at 1313 (Moore, J.); *id*. at 1327 (Linn, J.).

*i.e.*, "circuitry elements that perform mathematical calculations," are a "special purpose computer" and "not a disembodied mathematical concept which may be characterized as an 'abstract idea'").

The claims here meet the "meaningful limitations" test because, as the district court ruled, they are directed to "functional and palpable applications in the field of computer technology" to implement and apply the business ideas about which DDR's business-background inventors testified. A27 (citing *Research Corp. Techs., Inc. v. Microsoft Corp.*, 627 F.3d 859, 868 (Fed. Cir. 2010)). The district court further found, correctly, that, beyond "the concept of two web pages with visually corresponding elements, there is more to the asserted claims when considered as a whole." *Id.*; *see also* A26-27 (identifying the "more").

In some respects, the claims here resemble the *Ultramercial* claims found not abstract, in that both claims sets focus on "a specific application of a method implemented by several computer systems, operating in tandem, over a computer network," and both operate "in a cyber-market environment." 722 F.3d at 1350.[28]

WTH (*e.g.*, p. 24) offers just repeated denials that the infringed claims contain specifics, as opposed to mere "routine computer functions," but WTH fails

---

[28] The other computer-related cases cited by WTH (p. 27) have no bearing here. *Dealertrack, Inc. v. Huber*, 674 F.3d 1315, 1333 (Fed. Cir. 2012) (claim silent as to the significance of the computer in performing the method); *Cybersource v. Retail Decisions*, 654 F.3d 1366, 1376-77 (Fed. Cir. 2011) (claim mentioned "the Internet" merely as a location to perform the method).

to acknowledge, much less give specific reasons to challenge, the district court's findings of fact to the contrary. A reply brief is too late to offer such reasons. *See Harris Corp. v. Ericsson, Inc.*, 417 F.3d 1241, 1262-63 (Fed. Cir. 2005) ("[a] party's argument should not be a moving target"; there should be "adequate opportunity for response … by the opposing party") (citation omitted).

*Ultramercial* recognized that §101 determinations are "rife with underlying factual issues," including whether the claim has meaningful limitations. 722 F.3d at 1339. The district court made specific findings regarding those facts. Because WTH does not negate the substantial evidence cited in the district court's subsidiary factual findings (or the proof outlined above), this Court should affirm.

Finally, *Ultramercial* further recognized that "the presumption of proper issuance applies to a granted patent," and "when a patent issues, it does so after the Patent Office assesses and endorses its eligibility under §101 …." *Id*. at 1342. That observation has particular force here, given that the PTO issued the '399 Patent just weeks after the Supreme Court decided *Bilski v. Kappos*, *supra*, despite having been told of the ongoing *Bilski* appeal and the defense arguments in this lawsuit (which was stayed at the time). A163; A8872, 75 (1/8/09).

3.    The third test in *CLS Bank*, 717 F.3d at 1326 *ff*. (Newman, J., concurring in part), "propose[d] that the court return to the statute, and hold that when the subject matter is within the statutory classes in section 101, eligibility is

67

established." *See also id.* at 1335 (Rader, C.J., additional reflections) ("When all else fails, consult the statute!"). DDR easily passes that test, because its claims fit within the machine or process classes.[29] That should be enough, under Supreme Court precedent. *Diamond v. Chakrabarty*, 447 U.S. 303, 308 (1980) ("In choosing such expansive terms as 'manufacture' and 'composition of matter,' modified by the comprehensive 'any,' Congress plainly contemplated that the patent laws would be given wide scope."); *Diamond v. Diehr*, 450 U.S. 175, 182, 189-90 (1981) (the system of patents embraces "anything under the sun that is made by man") (citation omitted); *see* 35 U.S.C. §282 (litigation defense limited to failing to meet a "condition of patentability"); *cf. Bilski.* 130 S. Ct. at 3227 (describing §101 as "a dynamic provision designed to encompass new and unforeseen inventions") (citation omitted).

## VI.  The Court Properly Exercised Its Discretion to Allow DDR to Prove Infringement in Connection with Six of Nine WTH Customer Websites.

WTH's appeal of the admission of certain expert testimony, about infringement in connection with six of the nine WTH customers (pp. 42-44), fails to justify JMOL or show any abuse of discretion.

---

[29] '572 Patent Claim 13 and '399 Patent Claim 19 each cover a "system"; '572 Patent Claims 17, 20 cover a "process"; '399 Patent Claims 1, 3 cover a "method." *See also* 35 U.S.C. §100(b) ("The term 'process' means process, art or *method* …") (emphasis added); *NTP, Inc. v. Research in Motion, Ltd.*, 418 F.3d 1282, 1318-19 (Fed. Cir. 2005) ("[a] method or process consists of one or more operative steps …. [a] process is a series of acts") (citation omitted).

WTH never explains how admission of Dr. Keller's testimony regarding the six customers, even if improper, entitles WTH to the judgment against DDR sought by WTH's JMOL motion. The jury verdict did not find infringement on a site-by-site basis (at defendants' insistence). A3078. It heard, and saw, other infringement evidence. Had the district court sustained WTH's objections and excluded Dr. Keller's testimony, the jury could still have found infringement based on (1) its own visual review of the six websites, and (2) the three other websites.[30]

In any event, the trial court admitted Dr. Keller's testimony properly, upon learning that DDR had accused the six websites long before trial:

(1)     DDR's infringement contentions accused a common "platform" that hosted all nine accused websites (A2626-27; A2850-51); and

(2)     Dr. Keller's report had timely listed the six infringing sites and had charged infringement by (i) saying that the six websites "infringed for the same reasons" or in "substantially the same manner" as the three others, and (ii) showing corresponding overall look and feel descriptions for the six sites too. A3619-24; A3630-32; A7612-13.[31]

---

[30] As for the argument that the jury might have awarded lower damages, WTH cannot prove that they would have done so, and Digital River did not move for a new trial, so that is not a question for appeal. *See* Section VIII, *infra* (re: damages).

[31] WTH's other criticisms of the expert report, including ones that it did not argue below and thus waived, similarly lack merit: The expert report (1) *did not* use the word "most likely" to describe infringement, (2) *was not* "conclusory" (nor did the

In short, the district court acted reasonably and well within its discretion.[32]

## VII. The Jury Heard Substantial Evidence of WTH's Infringement of the '572 and '399 Patents.

The jury held that WTH had infringed claims 13, 17, and 20 of the '572 Patent and claims 1, 3, and 19 of the '399 Patent. The district court denied WTH's post-trial JMOL motion, holding that "substantial evidence" supported the verdict. A18-22. WTH's arguments to the contrary (pp. 45-56) lack any merit.

### a. The jury saw and heard substantial evidence of overall "look and feel" correspondence.

The jury had substantial evidence that WTH's served "composite web pages" each had a "look and feel" that "correspond[ed] to" the Host web page visually in terms of overall appearance:

---

absence of a formal claim chart matter) because it stepped through the claims element-by-element, claim-by-claim (A7617-23), (3) *did not* limit the analysis of the '399 Patent only to a statement that the claims were infringed only for the "same reasons" as the other patent (*e.g.*, A7622, ¶¶49-51 (discussing extra features of the '399 Patent)), and (4) *did not* omit reference to WTH's source code (A7611-17; *see especially* A7612 at line 2).

[32] WTH (p. 44) also accuses the district court of having applied a "different standard" by excluding certain WTH proffered evidence, although WTH did not appeal that ruling, nor even challenge it via JMOL or new trial motions. The district court had good reason to rule differently: Whereas DDR had complied with the local rules (E.D. Tex. L.R. 3-6(a)), WTH had not complied: WTH submitted no "invalidity contentions" (E.D. Tex. L.R. 3-3) of its own but tried to introduce evidence, which it revealed only a few weeks before trial, of WTH's activities during the prior art period, in violation of E.D. Tex. L.R. 3-4(b); also WTH argued that it did not wish to use the evidence for anticipation proof but rather to show "the state of the art" and could not explain the relevance. A2608-13. In sum, the district court applied the rules even-handedly, albeit reaching different results.

1.     "DDR provided the jury with images of the nine accused website pairs and lists of similarities between the site pairs." A4947 (WTH admission); A19.

2.     Dr. Keller testified to the correspondence. A19. WTH argues (pp. 46-47) that Dr. Keller opined only as to "colors and graphic images," not – consistent with the court's claim construction – "overall appearance." WTH's argument is incorrect: Dr. Keller specifically testified that his comparison matched the district court's construction and that he evaluated "overall appearance." A3673, 76-77; A3680, 85-88; A3735, 52-54.[33]

WTH further argues (p. 48) that its websites cannot be "based on" or "correspond to" the Host sites because WTH's "web pages principally contain [its] own cruise information."[34] But the claims expressly allow that "content based on the commerce object" – in WTH's case, the "cruise information content" – does not need to contribute to the correspondence in overall appearance. *E.g.*, '572 Patent, claim 13 (a "*composite* web page with a look and feel based on the look

---

[33] Also, the jury saw Dr. Keller's lists of specific similarities of look and feel "elements," as to all nine sites, presented through a demonstrative exhibit. A19. Contrary to WTH's argument (p. 47 & n.27) the court has discretion to allow a live witness to testify with reference to a demonstrative exhibit, even if the exhibit is not introduced. *E.g.*, *U.S. v. Ollison*, 555 F.3d 152, 162 (5th Cir. 2009) (allowing the use of charts "as 'pedagogical' devices") (citation omitted).

[34] Contrary to WTH's brief (pp. 46, 48, 49), a showing of the "same" overall appearance is not required under the claim language itself.

and feel description in the data store *and* with content based on the commerce object ….") (emphasis added).[35]

### b. **The jury heard substantial evidence that WTH servers were "in communication through the Internet with" Host web pages ('572 Patent, claim 13).**

The jury heard substantial evidence that WTH's servers were "in communication through the Internet with the host web page" (claim 13). WTH concedes (p. 50) that DDR's expert explained how that happened. A3674-76; A3740. Dr. Keller there explained that, when the visitor activates a link on a Host page, the visitor computer downloads ("retrieves") the page, then WTH server is "in communication" with the "page"; indeed, the Host web page sends a request to WTH's server, which proves that the server communicates with the web page.

WTH calls Dr. Keller's opinions "nonsensical" (p. 50), but the jury apparently disagreed. Likewise, Dr. Keller's opinions do not rest on inconsistent construction of the term "web page" or ignoring a different claim limitation. *Compare* WTH, p. 51 & n.27 *with* A3741 (Dr. Keller testifying there was no

---

[35] WTH argued this point below but never denied DDR's explanation based on the claim language. A8878. A reply brief on appeal is too late to explain. *See Harris Corp.,* 417 F.3d at 1262–63.

inconsistency). The jury was entitled to credit Dr. Keller's testimony on this point and did not have to believe WTH's expert to the contrary.[36]

### c. **The jury heard substantial evidence that WTH directed its customers to place links in Host pages ('572 Patent, claim 17).**

Both DDR and WTH experts testified that WTH "gives the URL or link to their partners to place on their host websites for customers to access the outsource website." A3679; A4425. The district court held that this was "sufficient to show that [WTH] controls its partners' action …." A19-20.

The cited evidence shows "control or direction," proving direct infringement under *Muniauction, Inc. v. Thomson Corp.,* 532 F.3d 1318, 1330 (Fed. Cir. 2008) (not changed by *Akamai Techs Co. v. Limelight Networks, Inc.,* 692 F.3d 1301, 1307 (Fed. Cir. 2012) (en banc)).

Dr. Keller testified not only that WTH gave links to its Hosts but also that it was "technically necessary to have that link within the website in order for a visitor to go from the host webpage to the outsource website." A3679. The properly instructed jury could easily infer that WTH thus "suppl[ied] the missing

---

[36] The jury likely viewed WTH's expert as having erred by (1) insisting on "direct" communication between the WTH server and a "host web page" (A4404-08), and (2) interpreting "web page" as requiring communication with a Host server before the page is downloaded (A4408-13; A4419-20). The claim language lacks both of those mandates (and contradicts the latter), and WTH never asked the district court to interpret the claim in those ways. *Conoco, Inc. v. Energy & Envtl. Int'l, L.C.,* 460 F.3d 1349, 1359 (Fed. Cir. 2006) ("[L]itigants waive their right to present new claim construction disputes if they are raised for the first time after trial.").

technology" to its Hosts, per the unobjected-to jury instruction, A3059-60, and thus directly infringed Claim 17 by controlling, or at least directing, its Hosts to include the necessary link to WTH's site on their respective Host sites. After all, without those links, WTH could not serve outsourced sites for its partners, and visitors would not be able to use WTH-hosted websites, frustrating the purpose of hiring WTH to run outsourced websites in the first place.[37]

The jury heard evidence, too, that a "URL web address" meets the definition of "link" under the claim construction. *Compare* WTH, p. 54 *with* A3668 (Keller: "the URL" was "the link that goes from the host webpage to the outsource webpage that's served by WTH."); A4425 (WTH expert: a "link to WTH's hosted site … is the URL."); A128 at box 755 (specification equating link and URL).

In sum, the jury heard these facts: (1) WTH gives its customers specific, unique URLs to place on their Host sites, (2) "the URL" is "the link" and a "link to WTH's hosted site … is the URL," (3) the URL allows visitors to navigate from a Host web page to a specific WTH outsource page, and (4) WTH's website cannot work without the links. Ample evidence existed to support the jury's inference that WTH directs its Hosts to include links (URLs) on their respective Host pages.

---

[37] Infringement may be established by circumstantial evidence. *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1317 (Fed. Cir. 2009); A3050 (jury instructed to this effect). The jury could also permissibly infer direction where WTH did not try to show mere arms-length cooperation or deny that WTH obligated its Hosts to use the WTH-supplied links.

### d. **The jury heard substantial evidence that WTH's servers automatically recognize a source web page of a Host ('399 Patent).**

The jury heard evidence that, when a visitor clicks a link on a Host web page, WTH's servers automatically recognize the identity of the "partner" whose Host page was clicked. A20; A4948. WTH's argument (pp. 54-55) about a lack of proof that its servers recognize "the source web page," which WTH's expert interpreted as the exact web address (URL), is wrong for the reason given by the district court: WTH "does not show where in the claim language or the Court's claim construction is there a requirement for a party to recognize the exact web address of the source web page to infringe." A20.

Substantial evidence supports that finding. The infringed '399 Patent claims themselves clarify that "the first web pages" are pages from different Hosts. A204, claim 1, part (a)(i) ("each of the first web pages belongs to one of a plurality of web page owners"). WTH even admits (p. 55) that the ability to keep track of which user came from which Host (so as to pay Hosts), is the key.[38] For both reasons, identifying which of the "plurality of web page owners" hosted the source page suffices to "recogniz[e] the source web page."

---

[38] WTH denies (pp. 55-56) that DDR proved that WTH could track which user came from which Host, even going so far as to call its expert's testimony to that effect "unrebutted." To the contrary, DDR submitted substantial evidence that, when the server detects a code such as "OBWEB," it "recognize[s] as the source page" that "the one of the first web pages on which the link has been activated" is "the one of the first web pages" belonging to Orbitz, rather than the first web pages belonging to other Hosts. A3668; A3675-76; A3702-03.

WTH never asked the district court to construe the '399 Patent to require recognition of the exact web address (URL); hence, it waived this argument. *Conoco,* 460 F.3d at 1359 ("[L]itigants waive their right to present new claim construction disputes if they are raised for the first time after trial.").

The district court rightly viewed this as a battle of experts that WTH lost. A20. Substantial evidence, from DDR's expert and in the claim wording, permitted the jury to disbelieve WTH's expert's attempt to add restrictions not in the claims.

### e. **WTH's "evidence only on one day" argument lacks basis.**

Substantial evidence supports the infringement verdict back to the January 2006 issue date of the '572 Patent. As the district court found, Dr. Keller testified that he looked at (1) the Internet archives (to check past "look and feel"), (2) WTH's source code, which WTH admits (p. 11) was the "same for all" customers (to check technical operation), and (3) WTH's single "platform" and changes to it. A21 (citing A3580-82; A3665-66). Based on that study, Dr. Keller found nothing "had changed in any substantial way" over the infringement period. A3751-52.

DDR did not need to have its expert visit infringing sites each day during years of infringing activity to demonstrate infringement throughout an entire span. *Lam, Inc. v. Johns-Manville Corp.*, 718 F.2d 1056, 1064 (Fed. Cir. 1983) ("patent owner's burden of proof is … a burden of reasonable probability"); A3072 (unchallenged jury instruction; "damage award … need not be proven with

unerring precision"). The jury was entitled to consider the entirety of the period preceding Dr. Keller's examination dates.

In the same section (pp. 57-58), WTH makes the point that four of its nine infringing websites could not infringe the '399 Patent because DDR's allegations of the infringing time period covered only the period before that patent issued.[39] But any error was harmless, as it made not a penny's difference in DDR's damages claim, because the jury found that all four listed sites infringed the '572 Patent, which was in force before the '399 Patent issued. A3078; A667. Moreover, the jury did not accept DDR's damages claim, and the verdict form did not specify which WTH websites infringed which patent (at appellants' insistence); instead, it cautioned the jury, "Only award damages for those claims you find both infringed and not invalid." A3080. In sum, there was no error in DDR's damage claim, and more importantly, there is no error in the verdict.

## VIII.  WTH's Challenge to "DDR's Damages Model" and the Jury's Damages Award Does Not Justify Reversal.

The jury awarded DDR $750,000 against WTH, substantially less than DDR's request, $6.04 million. A3080; A4702-03; WTH, p. 58. Nevertheless, WTH (p. 61) criticizes the award as "grossly excessive" for a grab bag of reasons.

---

[39] WTH correctly says that Dr. Keller admitted a timing error as to three of the four sites. DDR contended that Hotwire infringed after issuance of the '399 Patent, so Dr. Keller did not err as to that site. A3751.

77

WTH did not move for a new trial or request remittitur, so it did not preserve its "grossly excessive damages" argument for appeal. *See Industrias Magromer*, 293 F.3d at 924 ("In reviewing a jury award, we are reviewing the district court's denial of a motion for a new trial"); *Bueno v. City of Donna*, 714 F.2d 484, 493-94 (5th Cir. 1983) ("It is well established that there can be no appellate review of allegedly excessive … damages if the trial court was not given the opportunity to exercise its discretion on a motion for a new trial."); *DeWitt v. Brown*, 669 F.2d 516, 524 (8th Cir. 1981) ("the issue of the excessiveness of a jury verdict must be presented first to the District Court in a motion for a new trial in order to preserve the issue for appellate review."). Although WTH raised this issue through JMOL motion, "excessive damages" does not justify entry of judgment against DDR.

Further, as the district court ruled when denying JMOL, "even if [WTH's] criticisms are correct, showing error in DDR's damages claim does not demonstrate any error in the jury's damages award," because we "cannot attempt to reverse engineer the jury's math … and use … purely speculative[] analysis to call the award excessive." A31-32. WTH's brief does not try to explain any error.

WTH's "grossly excessive" contention, moreover, rests on inaccurate premises, namely: (1) that Dr. Keller showed infringement for only one day, and indeed a day after the damages period claimed (pp. 60, 61), which is rebutted above, (2) that DDR presented evidence for infringement before the '399 Patent

78

issued (p. 60 & p. 63 n.35), which ignores the overlapping infringement from the other patent, as also noted above, and (3) that DDR's damages expert failed to provide a reliable basis for the royalty rate, used a "25% rule," and failed to tie the damages to the invention (pp. 62-63), all of which assertions are inaccurate. A2257-62; A2853-55; A3791-92; A3795-96; A3802-07.[40]

The jury had a duty to award DDR a sum "in no event less than a reasonable royalty for use made of the invention," 35 U.S.C. §284, and WTH cites nothing to show that the amount awarded exceeded the statutorily required sum.[41]

## IX.   The Trial Court Properly Exercised Its Discretion in Awarding DDR Prejudgment Interest.

DDR is entitled to prejudgment interest under 35 U.S.C. §284 ("the court shall award patent damages … together with interest … as fixed by the court"). The district court held, "Prejudgment interest should be awarded under Section 284 absent some justification for withholding such an award." A37 (citing *Gen. Motors*

---

[40] Likewise irrelevant are WTH's comments (*e.g.*, pp. 3-4, 12, 61 n.33, 63) citing evidence that many of its sales are done by telephone and that it has other, noninfringing operations. WTH has no way to know whether the jury's hefty reduction of DDR's damages claim took such factors into account.

[41] Finally, this Court has no cause to honor WTH's remark (pp. 58-59) that the jury award "should be" considered as an "upfront, paid-in-full royalty" allegedly because "DDR disclaimed damages after April 2012." First, the jury awarded damages "for [WTH's] infringement through the time of trial" only. A3080. Second, WTH incorrectly represents that DDR "disclaimed damages"; to the contrary, DDR expressly announced that it "preferr[ed] to leave the question of remedies for future infringement to later lawsuits, if required." A4883, n.7. WTH seeks to prejudge a decision that may or may not arise in the related case.

*Corp. v. Devex Corp.*, 461 U.S. 648, 657 (1983); *Telcordia*, 612 F.3d at 1378); *accord Lummus Indus., Inc. v. D.M. & E. Corp.*, 862 F.2d 267, 275 (Fed. Cir. 1988) (withholding prejudgment interest "is the exception, not the rule").

WTH argues (p. 64) for an exception on the grounds that "DDR … is a non-practicing entity." First of all, DDR showed error in WTH's premise, because the patents were invented by people who worked for a practicing entity, called Nexchange Corporation, which employed over 100 people, and two of the inventors formed DDR to acquire the patents from Nexchange while in application stage. *See* part 4 of Stmt. Facts, *supra*. WTH repeats the false "NPE" charge without even trying to rebut DDR's evidence.

Second, as the district court noted (A40, emphasis in original), even if DDR qualified as an NPE, WTH "does not cite to *any* case law to support its position," and a district court hardly abuses its discretion by refusing to rule in favor of a party that cites no cases.

WTH does not cite any cases in its appeal brief either. Indeed, WTH offers no "justification" at all for treating NPEs unequally under the interest statute. Ironically, WTH consented to the trial court instructing the jury: "The law recognizes no distinction among types of parties. All … organizations stand equal before the law, regardless of the size and who owns them, and are to be treated as equals." A4770-71. This Court should endorse that basic principle.

The district court noted that WTH had "acknowledge[d] that [courts] customarily decline to toll prejudgment interest [for] re-examination proceedings," and the court followed that custom despite DDR's voluntary reexamination after finding that "the reexamination conserved judicial and party resources and it was not unreasonable or unjustified for DDR to seek a stay." A39-40. WTH refers to "DDR's undue delay" (p. 64) without any explanation to contradict the district court's finding to the contrary. It was well within the court's discretion to decline the invitation to view a "not unreasonable" stay – which saved everyone, including WTH, "resources" – as "justification" to apply an "exception" and limit the normal award of interest.

## CONCLUSION

DDR respectfully request this Court to affirm the judgment in its entirety and to award costs on appeal against both appellants.

Respectfully submitted,

By: ___/s/ Louis J. Hoffman___
     Louis J. Hoffman
     *Principal Counsel*
HOFFMAN PATENT FIRM
14301 North 87th Street, Suite 312
Scottsdale, Arizona  85260
Telephone: (480) 948-3295
Facsimile: (480) 948-3387
E-Mail: Louis@valuablepatents.com

*Attorney for Appellee DDR Holdings, LLC*

81

## CERTIFICATE OF SERVICE

Undersigned counsel hereby certifies that a copy of the foregoing BRIEF

OF PLAINTIFF-APPELLEE DDR HOLDINGS, LLC was served by electronic

filing and e-mail on December 20, 2013, upon:

Warren S. Huang
FULBRIGHT & JAWORSKI LLP
1301 McKinney, Suite 5100
Houston, Texas 77010-3095
*(Attorney for Appellant Digital River)*
warren.huang@nortonrosefulbright.com

Brett C. Govett
FULBRIGHT & JAWORSKI LLP
2200 Ross Avenue, Suite 2800
Dallas, Texas 75201
*(Attorneys for Appellant Digital River)*
Brett.govett@nortonrosefulbright.com

Norman H. Zivin
Tonia A. Sayour
COOPER DUNHAM LLP
30 Rockefeller Plaza
New York, New York 10112
*(Attorneys for Appellant WTH)*
nzivin@cooperdunham.com
tsayour@cooperdunham.com

  /s/ Louis J. Hoffman
*Louis J. Hoffman*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B), as adjusted by the relief requested through an unopposed motion to extend to 21000 words, because it contains 19989 words, excluding the exempted parts, according to the word count of the word-processing system used to prepare the brief.

/s/ Louis J. Hoffman
*Louis J. Hoffman*